892 F.2d 173
 Nicholas J. GENCARELLE, Claimant-Petitioner,
v.
GENERAL DYNAMICS CORPORATION, Self Insured Employer,
and
Insurance Company of North America, Carrier-Respondent,
and
Director, Office of Workers' Compensation Programs, United
States Department of Labor, Party-in-Interest-Respondent.
 No. 112, Docket 89-4054.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 28, 1989.
Decided Dec. 14, 1989.
 
 Carolyn P. Kelley, Groton, Conn. (Matthew Shafner, Cynthia Fausold Schwanz, O'Brien, Shafner, Bartinik, Stuart & Kelly, Groton, Conn., of counsel), for claimant-petitioner.
 Norman P. Beane, Jr., Murphy & Beane, Boston, Mass. (Diane M. Broderick, Boston, Mass., on the brief), for respondent General Dynamics Corp.
 John Jeffrey Ross, Office of the Sol., U.S. Dept. of Labor (Robert P. Davis, Sol. of Labor, Carol A. De Deo, Associate Sol., J. Michael O'Neill, Washington, D.C., Counsel for Longshore, of counsel), for Federal respondent.
 Before OAKES, Chief Judge, and LUMBARD and PIERCE, Circuit Judges.
 OAKES, Chief Judge:
 
 
 1
 Nicholas Gencarelle was denied permanent total disability benefits under the Longshore and Harbor Workers' Compensation Act (the "Act" or "LHWCA"), 33 U.S.C. §§ 901-50 (1982 & Supp. V 1987), for injuries to his knees allegedly relating to his years of general maintenance work at General Dynamics' Electric Boat shipyard in Groton, Connecticut. He petitions under 33 U.S.C. § 921(c) (1982) for review of the order of the Benefits Review Board ("BRB") denying the benefits sought. We affirm the order.
 
 
 2
 Gencarelle worked nearly continuously at the shipyard from 1951 to 1975. Since 1956, he was a general laborer or maintenance man. As he described his job, he "did everything"--clean buildings, sweep roads, move furniture, and more. His responsibilities included bending over to clean underneath benches, squatting to clean under machines, and climbing to clean out ventilation and air ducts. In December 1966, Gencarelle stepped into a hole and twisted his right knee while walking down the south yard hill and was treated thereafter for a couple of months. He testified that he banged his knees several times, but only reported one of these incidents on December 4, 1967, for which on June 14, 1968, he was given a five percent permanent partial disability for loss of use under the Connecticut workers' compensation law.
 
 
 3
 Several years later, in January 1974, Gencarelle slipped and injured his left knee while cleaning the machine shop. He reported the injury and missed two days of work. In April 1975, he visited the shipyard hospital to report that both knees were in pain and to request a doctor's examination, but not to report any new injury. In May 1975, General Dynamics filed an injury report with the Secretary of Labor as required under 33 U.S.C. § 930(a) (Supp. V 1987) for the January 1974 injury. Gencarelle last worked in June 1975 and did not work thereafter, first because of a strike at the shipyard and then because of asbestosis for which he received workers' compensation benefits from December 1975 to December 1977 and ultimately a lump sum settlement.
 
 
 4
 After complaints of knee pain in March of 1978, Gencarelle was diagnosed on April 24, 1978, as having chronic synovitis. This is a chemical reaction of the lining of the knee joint to debris cast off from a degenerating or arthritic knee. On May 10, 1978, Gencarelle telephoned General Dynamics to report his condition and that he was to have surgery on both knees. He did undergo orthopedic surgery and had his right knee replaced in July 1978. On December 3, 1979, Gencarelle finally filed a claim arising from injuries to his knees for workers' compensation, which was served on his employer on January 17, 1980. In March 1982, General Dynamics filed an injury report with the Secretary of Labor for Gencarelle's chronic synovitis.
 
 
 5
 Gencarelle alleges that his synovitis was a different injury than any of the ones reported before. It was not, he alleges, the result of either the 1966, 1967, or 1974 injuries to his knees. Rather, he claims the synovitis was the result of repetitive trauma--bending, stooping, and climbing--required by his job that occurred after his last reported injury in January 1974 and before he left work in June 1975.
 
 
 6
 The Administrative Law Judge ("ALJ") found that Gencarelle's synovitis was not the result of repetitive trauma, but rather was due to a combination of his previous knee injuries. Even assuming, however, that his synovitis was related to repetitive trauma, the ALJ concluded that Gencarelle did not timely notify General Dynamics under 33 U.S.C. § 912(a) (Supp. V 1987) or timely file his claim under 33 U.S.C. § 913(a) (1982) since he knew or reasonably should have known that his knee condition was work-related as early as 1975.
 
 
 7
 On appeal, the BRB, applying the statutory presumption that all claims are within the coverage of the Act, 33 U.S.C. § 920(a) (1982), found that General Dynamics had not carried its burden of showing that Gencarelle's synovitis was not work-related. Nevertheless, it found that the claim was time-barred by the statute of limitations. Concluding that Gencarelle's chronic synovitis was not an "occupational disease," the BRB found that the special two-year statute of limitations for occupational diseases, 33 U.S.C. § 913(b)(2) (Supp. V 1987), running from the date of the employee's awareness of the relationship between the disease and his employment, did not apply. Accordingly, the one-year statute of limitations for all other work-related injuries had run by December 1979, the time when Gencarelle filed his claim. Further, the BRB found that the statute of limitations was not tolled under 33 U.S.C. § 930(f) (1982) by the employer's late filing of a report of the synovitis to the Secretary of Labor, because the synovitis was related to the 1974 injury for which General Dynamics had already filed a report. The BRB did not consider whether Gencarelle properly or timely notified General Dynamics of his injury.
 
 
 8
 In affirming the decision of the BRB, we note that the Director of the Office of Workers' Compensation Programs, Department of Labor, takes the broad position that Gencarelle's chronic synovitis, brought about by cumulative trauma, is an occupational disease, the cumulative trauma aggravating a pre-existing condition. We find, however, that Gencarelle's synovitis was not peculiar to his employment and so was not an occupational disease in this case. We hold, moreover, that General Dynamics' filing in 1975 of an injury report prevented tolling of the statute of limitations.
 
 DISCUSSION
 
 9
 The Longshore and Harbor Workers' Compensation Act is a federal program to compensate maritime employees for on-the-job injuries leading to death or disability. See 33 U.S.C. § 903(a) (Supp. V 1987). "Injury" is defined to include only accidents and "occupational diseases" arising in the course of employment. See 33 U.S.C. § 902(2) (1982).
 
 
 10
 All disability claims are subject to a one-year limitations period, see 33 U.S.C. § 913(a), except occupational disease claims which enjoy a two-year limitations period from the date that the employee becomes aware or should have been aware of the relationship between the disease, his resulting disability, and his employment. See 33 U.S.C. § 913(b)(2).
 
 
 11
 At the very latest, Gencarelle became aware of his synovitis in April 1978 when diagnosed. He did not file his claim until eighteen months later in December 1979. Therefore, unless his synovitis is an occupational disease, his claim is time-barred.
 
 
 12
 Congress has never defined "occupational disease" for purposes of the Act.[1] A panoply of definitions have sprouted from state courts and legislatures for state workers' compensation programs. See generally 1B A. Larson, The Law of Workmen's Compensation §§ 41.00-41.32, at 7-353 to -373 (1987 & Supp.1988). The generally accepted definition of an occupational disease is "any disease arising out of exposure to harmful conditions of the employment, when those conditions are present in a peculiar or increased degree by comparison with employment generally." Larson, supra, § 41.00, at 7-353.
 
 
 13
 From this definition emerge at least three elements that must be satisfied before finding that an employee has an occupational disease. First, the employee must suffer from a "disease." The term "disease" has been expansively interpreted to include any " 'serious derangement of health' or 'disordered state of an organism or organ.' " Larson, supra, § 41.42, at 7-408 (citation omitted). No fewer than eleven states and Puerto Rico recognize by statute synovitis as a type of disease that may qualify as an occupational disease. Larson, supra, § 41.71, at 7-499.
 
 
 14
 Second, "hazardous conditions" of employment must be the cause of the disease. Traditionally, these hazardous conditions have been of an external, environmental nature such as asbestos, coal dust, or radiation. Here Gencarelle alleges that the hazardous condition was the activity of repeated straining of his knees required by his work. At least one district court from this circuit has recognized (with little analysis) an injury from cumulative trauma to the body as an occupational disease under the LHWCA. See Travelers' Ins. Co. v. Locke, 56 F.2d 443, 444 (S.D.N.Y.1931). A number of state courts across the country, without specific legislative authorization, have done the same.[2] See, e.g., Fruehauf Corp. v. Workmen's Compensation Appeals Bd., 68 Cal.2d 569, 440 P.2d 236, 68 Cal.Rptr. 164 (1968) (back condition from repeated bending, twisting, and lifting of seventy-five to eighty pound weights); Underwood v. Nat'l Motor Castings Div., 329 Mich. 273, 45 N.W.2d 286 (1951) (back condition from engaging in repetitive bending and twisting involved in placing forty pound "cores" into ovens); DeBella v. Hotel Windsor, 284 A.D. 919, 920, 134 N.Y.S.2d 389, 390 (3d Dep't 1954) (hotel bellhop's herniated disc from "series of traumas to the spine in lifting and carrying bags"); Shelby Mutual Ins. Co. v. Dep't of Indus., Labor and Human Relations, 109 Wis.2d 655, 327 N.W.2d 178 (1982) (herniated disc suffered during vacation after twenty-four years of work in garbage collection and road repair work involving repeated lifting); but see Western Elec. Co. v. Gilliam, 229 Va. 245, 329 S.E.2d 13 (1985) (tenosynovitis in hand of assembly line worker not occupational disease, because general public also susceptible).
 
 
 15
 We are wary, however, that defining any repetitive motion such as walking or stooping as a hazardous condition may go beyond the scope of benefits intended by Congress in providing a compensation program for longshore and harbor workers. Because we decide this case on other grounds, it is not necessary for us to decide here whether activities involving cumulative trauma to the body, such as those discussed in the Director's brief, qualify as "hazardous conditions" for purposes of an "occupational disease."
 
 
 16
 The third element of an occupational disease is that the hazardous conditions must be "peculiar to" one's employment as opposed to other employment generally. Speaking for this court, Judge Learned Hand concluded:
 
 
 17
 It is indeed necessary not to extend the statute [LHWCA] so as to make it a general health insurance, and to avoid this the coverage [for occupational disease] must be limited to diseases resulting from working conditions peculiar to the calling. In order to recover a workman must be exposed to hazards greater than those involved in ordinary living, and the disease must arise from one of these.
 
 
 18
 Grain Handling Co. v. Sweeney, 102 F.2d 464, 465 (2d Cir.) (citations omitted), cert. denied, 308 U.S. 570, 60 S.Ct. 83, 84 L.Ed. 478 (1939); see also Director, Office of Workers Compensation Programs v. General Dynamics Corp., 769 F.2d 66, 68 (2d Cir.1985) (finding no evidence that claimant's disease resulted from "a hazard peculiar to" his work).
 
 
 19
 The relevant comparison is between the hazardous conditions at the claimant's workplace and the corresponding conditions--or background risks--of employment generally. See Goldberg v. 954 Marcy Corp., 276 N.Y. 313, 319, 12 N.E.2d 311, 313 (1938) ("disease" on legs of theater ticket seller not hazard of her employment). The hazardous activity need not be exclusive to one's employment; it need only be sufficiently distinct from hazardous conditions associated with other types of employment. See Underwood, 329 Mich. at 276, 45 N.W.2d at 287.
 
 
 20
 Gencarelle's activities were not "peculiar to" his employment as a maintenance man. Many occupations--blue collar and white collar alike--require repeated bending, stooping, squatting, or climbing. Even necessary non-occupational activities, such as cleaning a bathroom or sweeping a floor, require repeated stress on the knees as well as other joints in the body. Gencarelle's activities were common to many occupations, indeed to life in general. They are not the repetitive biomechanical stresses that have been recognized as leading to occupational diseases.
 
 
 21
 Gencarelle argues that even if his condition is not an occupational disease for purposes of qualifying for the two-year statute of limitations, the statute of limitations was tolled until after he made his claim, because General Dynamics did not file an injury report for his chronic synovitis until 1982. Indeed, 33 U.S.C. § 930(f) provides for tolling of the statute of limitations for so long as an employer with notice or knowledge of an employee's injury fails to file a report with the Secretary of Labor.
 
 
 22
 The BRB found that once an employer has filed an initial report, such as General Dynamics' report in 1975 of Gencarelle's 1974 injury, it suffices to prevent tolling of the limitations as to all "possible sequelae" injuries such as Gencarelle's synovitis. We agree that an employer need not file a separate report at every stage of a developing injury. The BRB's conclusion nevertheless assumes that the synovitis was a sequel to the reported injury of 1974 and not, as Gencarelle contends, to repetitive trauma thereafter. We find that the ALJ relied on substantial evidence in the record, based on Gencarelle's failure to report or seek treatment for his knees from June 1975 to April 1978 and the lack of forthright medical opinion showing the necessary link, in finding that Gencarelle's synovitis did not result from repetitive trauma occurring after January 1974 and before he left work in June 1975.
 
 
 23
 The order of the BRB is therefore AFFIRMED.
 
 
 
 [1]
 33 U.S.C. § 902(2) refers to an "occupational disease" as a type of "injury" for purposes of recovery under the Act. In recent testimony before Congress, repetitive motion or cumulative trauma disorders from "chronic exposure of a particular body part to repeated biomechanical stress" have been mentioned as warranting serious concern. Hearings Before the Subcomm. on Employment and Housing of the House Comm. on Gov't Operations, 101st Cong., 1st Sess. (June 6, 1989) (testimony by Dr. Lawrence J. Fine, Division of Surveillance, Hazard Evaluations, and Field Studies (National Institute for Occupational Safety and Health, Centers for Disease Control)), reprinted in Brief for Federal Respondent (appendix)
 
 
 [2]
 Although some states maintain lists of occupational disease, all fifty states have general occupational disease coverage, see Larson, supra, § 41.10, at 7-353, which of course invites courts to include and exclude borderline diseases. See Larson, supra, § 41.42, at 7-408