In the
United States Court of Appeals
For the Seventh Circuit

No. 99-3853

Bunge Corporation and CIGNA Property
and Casualty,

Petitioners,

v.

Mark Carlisle and T. Michael Kerr, Deputy
Assistant Secretary of the Office of Worker
Compensation Programs,

Respondents.

Petition For Review of an Order
of the Benefits Review Board
BRB No. 98-1604.

Argued May 12, 2000--Decided September 19, 2000

Before Ripple, Manion, and Williams, Circuit Judges.

Williams, Circuit Judge.  Respondent Mark Carlisle worked for the Bunge Corporation from 1981 to 1996. From 1986 until he left Bunge, Carlisle worked as a river operator. Upon leaving Bunge, Carlisle filed a workers' compensation claim with Bunge and its insurer, CIGNA Property and Casualty, pursuant to the provisions of the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. sec. 901 et seq. The LHWCA is a federal program created to compensate maritime employees for on-the-job injuries leading to death or disability. An administrative law judge ("ALJ") awarded Carlisle temporary total disability benefits from March 18, 1996, until June 13, 1997, at which time the ALJ awarded Carlisle permanent total disability benefits. On appeal, the United States Department of Labor Benefits Review Board ("BRB") affirmed the ALJ's decision. Bunge and CIGNA (collectively "Petitioners") now petition the court for review. Bunge asserts that: (1) Carlisle's claim for benefits was not timely filed; (2) Carlisle was not permanently disabled; and (3) Bunge met its burden to identify suitable alternative employment options for Carlisle. Because we find

that the ALJ's decision was consistent with governing law and supported by substantial evidence, we affirm.

I


For ten of the fifteen years Mark Carlisle spent at Bunge, he worked as a river operator. As a river operator, Carlisle spent a lot of his time unloading barges, which contained various beans and grains. To unload the barges, Carlisle was required to lift heavy barge doors and to operate a joystick designed to control and direct the simultaneous movement of two huge "tugger" buckets that lift the beans and grains from the barges. On the job, Carlisle would usually have to operate joysticks for three to four hours per day, but occasionally, this would increase to eight hours per day for several weeks at a time. Bunge admits that operating the joystick involved repetitive motion of Carlisle's hand and arm.


In March 1996, Carlisle informed his supervisor at Bunge that his arms were hurting. Initially, he went to his family doctor, Dr. Gordon Jones ("Jones"), and reported that he felt pain, weakness, and loss of grip strength while performing certain work activities. Jones told Carlisle he had epicondylitis, advised him to wear his arm in a splint, and prescribed medicine for the pain. In April 1996, Carlisle saw the company physician, Dr. Gordon Eller ("Eller"). Eller twice conducted diagnostic studies of Carlisle's condition and ultimately concluded that Carlisle suffered from bilateral carpal tunnel syndrome and ulnar nerve fracture neuritis. Eller did not attribute Carlisle's condition to his work. Rather, he opined that Carlisle's condition was the result of a more gradual disease process. Eller recommended that Carlisle either have surgery to try and repair the damage or find alternative work.


On the advice of counsel, Carlisle later saw another physician, Dr. McGinty ("McGinty"), who made a similar diagnosis--carpal tunnel and cubital tunnel syndromes-- but did not recommend surgery./1 Unlike Eller, McGinty did attribute Carlisle's condition to the nature of his work. McGinty concluded that Carlisle's condition resulted from the "repetitive and arduous use of his wrists and arms" on the job and predicted that surgery would not likely improve Carlisle's injuries. Carlisle took McGinty's advice and decided not to have surgery.

Although Carlisle stopped working in April 1996,

he did not file a notice of injury until June 25, 1997 or a claim for workers' compensation until July 30, 1997. Petitioners opposed the claim arguing that Carlisle failed to file his claim within the statute of limitations under Sections 12 and 13 of the LHWCA and that, alternatively, Carlisle was not entitled to permanent total disability benefits. After a hearing, the ALJ concluded that (1) Carlisle's disease was an occupational disease, which entitled him to a two-year statute of limitations; (2) Carlisle's condition had reached maximum medical improvement and therefore he was permanently disabled; and (3) Carlisle was totally disabled since Petitioners failed to meet their burden of finding that suitable alternative employment existed for Carlisle. Now, Bunge and CIGNA petition this court for review.

II

We review the ALJ decision to determine whether it was "rational, supported by substantial evidence, and consistent with governing law." Freeman United Coal Co. v. Hunter, 82 F.3d 764, 767 (7th Cir. 1996). Here, "substantial evidence" means more than a scintilla, but not necessarily a preponderance. Id. It differs from the preponderance of evidence standard in that it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," rather than evidence showing that "it is more likely than not that the evidence establishes the proposition in question." American Grain Trimmers v. Office of Workers' Compensation Programs, 181 F.3d 810, 817 (7th Cir. 1999) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971)). Our job on review of an ALJ decision to grant or deny workers' compensation benefits is simply to consider whether the ALJ looked at all relevant medical evidence, substituted his or her judgment for that of a qualified expert, or disregarded the opinion of a qualified expert absent evidence to the contrary or a legal basis for doing so. See Peabody Coal Co. v. Vigna, 22 F.3d 1388, 1392 (7th Cir. 1994). After examining the ALJ's findings, we must look to the BRB's decision to confirm that the BRB appropriately reviewed the ALJ's determination and committed no legal error. As in most other instances, any question of law is reviewed de novo. Shelton v. Old Ben Coal Co., 933 F.2d 504, 506 (7th Cir. 1991).

A. Occupational Disease/Statute of Limitations

Petitioners contend that Carlisle did not file his claim for disability benefits within the appropriate statute of limitations ("SOL") period. Ordinarily, the SOL for bringing a claim under the LHWCA is one year. See 33 U.S.C. sec. 913(a). However, the ALJ found that because Carlisle's condition was an occupational disease, he was entitled to an extended two-year SOL, whereby a claim is timely

if filed within two years after the employee or claimant becomes aware, or in the exercise of reasonable diligence or by reason of medical advice should have been aware, of the relationship between the employment, the disease, and the death or disability, or within one year of the date of the last payment of compensation, whichever is later.

33 U.S.C. sec. 913(b)(2).

Petitioners argue that the ALJ erred in classifying Carlisle's condition as an occupational disease. On March 19, 1996, Carlisle reported pain in his arm to his supervisors at Bunge. Dr. Eller examined Carlisle on April 11, 1996. He diagnosed Carlisle's condition and advised him to have surgery. However, it was not until June 13, 1997, that Dr. McGinty informed Carlisle that his condition was directly related to his work as a river operator. Carlisle filed his formal claim for compensation on July 30, 1997, which is within two years after even the earliest possible date (April 11, 1996) he could be said to have known (constructively or otherwise) about the connection between his job and his condition. Therefore, the question for the court is whether the ALJ properly classified Carlisle's condition as an occupational disease.

Congress has not explicitly defined occupational disease for LHWCA purposes. In its decision and order awarding benefits, the ALJ defined "occupational disease" as "any disease arising out of exposure to harmful conditions of the employment, when those conditions are present in a peculiar or increased degree by comparison with employment generally." Accord 1B A. Larsen, The Law of Workmen's Compensation, sec. 41.00, at 7-353. Other courts have adopted this definition as well. See LeBlanc v. Cooper/T. Smith Stevedoring, Inc., 130 F.3d 157, 160 (5th Cir. 1997) (citing Larsen's definition of occupational disease); Gencarelle v. General Dynamics Corp., 892 F.2d 173, 176 (2nd Cir. 1989) (classifying the Larsen definition as "the generally accepted definition of an occupational disease")./2 Two specific characteristics of an occupational disease are

(1) an inherent hazard from continued exposure to conditions of a particular employment and (2) a gradual, rather than sudden onset. See 1B A. Larsen, Workman's Compensation Law, sec. 41.31 (1992).

Petitioners argue that Carlisle's condition cannot be classified as an occupational disease because the harmful conditions of his employment are not present in a "peculiar or increased degree by comparison with employment generally." However, the ALJ found otherwise. The ALJ reasoned that because both Ellers and McGinty believed Carlisle's condition to be caused by "repetitive hand and arm movements which require flexion and extension of the hands, wrists, and arms," he found persuasive McGinty's conclusion that Carlisle's condition was caused by the repetitive joystick work he had to perform as a river operator. The ALJ explained:

The duties involving repetitive hand and arm movements are peculiar to Claimant's job as River Operator, a job which he performed since August of 1986. There is no evidence of record that Claimant engaged in any other activities which required sustained repetitive movements nor is there any evidence that Claimant's condition could develop in the absence of some form of long-term repetitive hand and arm movement. Dr. McGinty persuasively states . . . that Claimant's use of joysticks would require "a marked amount of flexion/extension, ulnar and radial flexion in alternating movements."

The ALJ went on to note that Carlisle found the pain he experienced intolerable and that it had worsened over time and that even Eller admitted that Carlisle's condition was part of an ongoing disease process that would continue to worsen.

Given the substantial evidence standard, we see no reason to disturb the ALJ's findings. As we noted above, the standard of substantial evidence requires no more than "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Diaz v. Chater, 55 F.3d 300, 305 (7th Cir. 1995) (quoting Richardson, 402 U.S. at 401 (1971)). There is certainly more than a scintilla of evidence to suggest that Carlisle has an occupational disease. Bunge itself indicated that one of Carlisle's duties was repetitive joystick and bobcat lever work. It is not unreasonable to conclude that spending even fifteen percent of the time, using hands and arms, repetitively controlling a joystick or lever, is a potentially harmful work condition of a peculiar or increased degree. Further, both

physicians who examined Carlisle agree that his work activities contributed to his condition. McGinty testified that the joystick and lever work Carlisle had to perform was a direct cause of his condition. Eller admitted that the work at least aggravated Carlisle's condition. Therefore, the ALJ's conclusion that the "repetitive biomechanical stresses" inherent in Carlisle's job led to an occupational disease is both rational and supported by substantial evidence and governing law. Accordingly, the ALJ did not err in applying the two-year SOL available to claimants with an occupational disease to Carlisle's claim.

B.  Permanent and Total Disability

Next, Petitioners argue that the ALJ erred in finding Carlisle permanently and totally disabled and to grant him workers' compensation benefits. The LHWCA provides coverage for four separate categories of disabilities: (1) permanent total disability, (2) temporary total disability, (3) permanent partial disability, and (4) temporary partial disability. This statutory structure contemplates two independent areas of analysis: nature or duration of disability (temporary or permanent) and degree of disability (total or partial). See 33 U.S.C. sec. 908(a)-(d). Courts have looked to two separate indicators as proof of permanent and total disability. Once an employee reaches maximum medical improvement, he is often considered permanently disabled. When no suitable alternative employment can be found for a disabled employee, he is usually deemed totally disabled. See SGS Control Servs. v. Director, Office of Workers' Compensation Programs, 86 F.3d 438, 443-44 (5th Cir. 1996); Stevens v. Director, Office of Workers' Compensation Programs, 909 F.2d 1256, 1259 (9th Cir. 1990). Petitioners argue that there was insufficient evidence to establish that Carlisle was either permanently or totally disabled.

1.  Permanent Disability

The ALJ held that Carlisle had reached maximum medical improvement for a work-related occupational disease and therefore was permanently disabled and eligible for permanent disability benefits. Petitioners contend that because Carlisle unreasonably refused to undergo surgery, the ALJ's ruling was wrong. "Maximum medical improvement is attained when the injury

has healed to the full extent possible." Stevens, 909 F.2d at 1257. According to Petitioners, before Carlisle can be considered to have reached maximum medical improvement, he needed to have surgery and attempt to improve his condition./3 Petitioners base much of their argument on Eller's opinion and recommendation that Carlisle have surgery. In contrast, the ALJ found persuasive McGinty's assessment of Carlisle's condition and concluded that surgery was not necessary before a finding of maximum medical improvement could be made.

The Fifth Circuit has held that a claimant under the LHWCA is considered permanently disabled "when [a claimant's] condition has continued for a lengthy period, and it appears to be of lasting or indefinite duration, as distinguished from one in which recovery merely awaits a normal healing period." SGS Control Services, 86 F.3d at 443-44 (internal quotations omitted). While Eller and McGinty ultimately disagreed as to which treatment Carlisle should have sought, both doctors agreed that Carlisle's condition would always affect his ability to engage in activity requiring use of his hands and arms and that if Carlisle tried to return to his old job, the symptoms of his condition would be likely to recur. Eller concluded that if Carlisle were to undergo surgery, he had a fifty percent chance of being able to return to his prior job. McGinty did not recommend surgery and concluded that Carlisle was permanently disabled. He testified that "[Carlisle] cannot do the work that he was [formerly] doing and the chance of being able to return to that type of activity is very limited even with an attempt to repair these problems surgically." Both doctors' testimony suggests the permanence of Carlisle's condition.

Petitioners maintain that the ALJ should have accepted Eller's medical conclusion instead of McGinty's. However, the ALJ determines the weight to be accorded to evidence and makes credibility determinations. Moreover, where the testimony of medical experts is at issue, the ALJ is entitled to accept any part of an expert's testimony or reject it completely. See Mendoza v. Marine Personnel Co., Inc., 46 F.3d 498, 500-01 (5th Cir. 1995) (citations omitted). Here, upon review of both McGinty's and Eller's testimony, the ALJ concluded that the surgery Eller recommended "would fail to alleviate or cure Claimant's underlying conditions" and that "surgery which only addresses the symptoms of a condition, but not the condition itself, is not a viable option." We find that there was substantial medical evidence to support the ALJ's conclusion. Nothing in the ALJ's decision was irrational,

unsupported by substantial evidence, or prohibited by governing law.

2.   Total Disability

Petitioners also dispute the ALJ's finding as to Carlisle's total disability. Disability under the LHWCA is "incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or any other employment." 33 U.S.C. sec. 902(10). To gain an award of benefits for total disability under the LHWCA, a claimant must first establish a prima facie case by demonstrating that he cannot perform his prior employment due to the effects of a work-related injury. See Universal Maritime Corp. v. Moore, 126 F.3d 256, 264 (4th Cir. 1997). Once a prima facie case has been established, the burden shifts to the employer to demonstrate "the availability of suitable alternative employment which the claimant is capable of performing." Brooks v. Director, Office of Workers' Compensation Programs, 2 F.3d 64, 65 (4th Cir. 1993) (per curiam). If the employer fails to meet this burden, the employee's disability is classified as "total, and most likely, permanent." Stevens, 909 F.2d at 1258, and the claimant is entitled to total disability benefits.

Both parties agree that Carlisle has established a prima facie case of total disability. Petitioners, however, insist that the ALJ erred in finding Carlisle totally disabled because they met their burden to show that suitable alternative employment opportunities existed for Carlisle. Bunge claims that its expert presented numerous suitable job options that were available to Carlisle. The ALJ, however, found that the report Bunge's expert offered was insufficient to show that suitable job opportunities existed.

There is some disagreement among the circuits as to what information employers must provide to meet the burden of showing suitable employment alternatives for claimants. The Ninth Circuit requires the employer to identify specific positions for a specific employer, that the claimant can perform and that the claimant could likely obtain, see Hairston v. Todd Shipyards Corp., 849 F.2d 1194, 1196 (9th Cir. 1988); Bumble Bee Seafoods v. Director, Office of Workers' Compensation Programs, 629 F.2d 1327, 1329 (9th Cir. 1980), while the First, Fourth and Fifth Circuits utilize a more moderate test in

which employers must simply present evidence that a range of jobs exists that is reasonably available and that the disabled employee could realistically secure and perform, see Trans-State Dredging v. Benefits Review Bd., 731 F.2d 199, 201 (4th Cir. 1984); New Orleans (Gulfwide) Stevedores v. Turner, 661 F.2d 1031, 1042-43 (5th Cir. 1981); Air America, Inc. v. Director, Office of Workers' Compensation Programs, 597 F.2d 773 (1st Cir. 1979). We find the latter test to be the more reasonable one. A more stringent test might result in more claimants choosing to forgo rehabilitation and the opportunity to find gainful employment in an alternative environment.

   Therefore,"if it is established that there are jobs which the claimant can realistically perform and secure, there may not be a finding of total and permanent disability under LHWCA." Turner, 661 F.2d at 1043. An employer may satisfy its burden in two ways. First, the employer may itself make available to the injured employee suitable alternative employment. See Darby v. Ingalls Shipbuilding, Inc., 99 F.3d 685, 688 (5th Cir. 1996). Second, the employer may demonstrate that suitable alternative employment is available to the injured worker in the relevant labor market. See Norfolk Shipbuilding & Drydock Corp. v. Hord, 193 F.3d 797, 800 (4th Cir. 1999). To rebut Carlisle's showing of total disability, Bunge needed to answer two questions: (1) whether there were jobs Carlisle was capable of performing, taking into consideration his age, background, education, training, etc.; and (2) whether those jobs were reasonably available in the community in which Carlisle was able to compete and whether they could realistically be secured. See Trans-State Dredging, 731 F.2d at 201.

   At the hearing before the ALJ, Petitioners offered the testimony of a vocational rehabilitation counselor, Mary McKnight, who conducted a market survey of potentially available job positions for Carlisle. McKnight limited her search to jobs with no tasks requiring heavy lifting or repetitive movement of the arms, hands or wrists and to jobs located within thirty miles of Carlisle's residence. She produced a list of jobs that included openings for a part-time cashier, a police officer, and an inspector at a plastics factory. She also identified other jobs that were available but that she was not sure would meet Carlisle's work limitations. None of her reports contained descriptions of the duties that Carlisle would be required to perform however. The ALJ reviewed the offerings McKnight presented and concluded that

Petitioners "failed to provide information regarding the duties of the jobs it located." He then compared the requirements for the proffered jobs as listed in the Dictionary of Occupational Titles with the physical, educational, age, and skill limitations Carlisle had that were demonstrated in the record and found that Petitioners did not present suitable alternative employment for Carlisle.

Petitioners maintain that the ALJ was wrong to require more specific information from its vocational expert and that in so doing, he was applying a more stringent test than was necessary. This argument misses the mark. The problem with the expert testimony Petitioners provided was not that it failed to be specific in naming actual employers who would hire claimant, but that it failed to be specific in considering Carlisle's capabilities when it attempted to identify potential jobs. While Petitioners did not need to show that there were specific, prospective employers in the area ready and willing to hire Carlisle, a report simply matching general statements of Carlisle's job skills with general descriptions of jobs fitting those skills is not enough to show that suitable employment alternatives existed for Carlisle. We give great deference to the ALJ's decision not to credit the vocational expert's testimony, and we conclude that the decision was a reasonable one. As such, we find that the ALJ did not err in deciding that Petitioners failed to establish that suitable job opportunities existed for Carlisle and that Carlisle was therefore totally and permanently disabled.

III

For the reasons set forth above, we DENY the petition for review and AFFIRM the judgment of the Benefits Review Board.

/1 Although the diagnoses of Eller and McGinty originally differed slightly, the parties have stipulated that the nature of Carlisle's claimed injury is carpal tunnel syndrome.

/2 Both Carlisle and the Office of Workers' Compensation Programs (OWCP) filed briefs as appellees. The OWCP urges the court to reject the ALJ's use of the "peculiar or increase degree" standard and define occupational disease as one which simply "arises naturally out of such employment." See 33 U.S.C. sec. 902(2). Bunge claims that we lack jurisdiction to even consider

this argument, as it should have been brought in a cross-appeal. We see no reason to go beyond the issue at hand to reach this broader, policy-oriented question. A number of courts have used the "peculiar or increased degree" standard and we find that it is a reasonable test, in light of both the legislative history and policy objectives.

/3 Bunge also contends that Carlisle's refusal to undergo surgery was unreasonable. We need not entertain this argument. What we think about Carlisle's decision not to have surgery is irrelevant. What does matter is whether the ALJ's decision to rely upon McGinty's medical opinion as to the permanency of Carlisle's condition was a reasonable and legally sound one. As such, our discussion centers around this question.