In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-4094

ROBERTA SKINNER,

*Plaintiff-Appellant,*

*v.*

MICHAEL J. ASTRUE,
Commissioner,[Œ]

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 C 9068—**Rebecca R. Pallmeyer**, *Judge.*

ARGUED MAY 31, 2006—DECIDED MARCH 7, 2007

Before KANNE, EVANS, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* Roberta Skinner suffers from
symptoms related to her diabetes and hypertension. In
2002 she filed an application for Supplemental Security
Income ("SSI"), which was denied initially and on recon-
sideration. Dissatisfied with these determinations, Skinner

---

[Œ] Pursuant to FED. R. APP. P. 43(c), we have substituted Michael
J. Astrue for Jo Anne B. Barnhart as the named defendant-
appellee.

requested a hearing before an administrative law judge ("ALJ") but indicated that she did not wish to appear in person and asked that a decision be made based on the written record. The ALJ denied benefits, finding that Skinner's symptoms did not constitute a severe impairment limiting her ability to perform basic work-related activities. The Social Security Appeals Council denied review, and Skinner filed this action for judicial review in district court. The court granted summary judgment for the Social Security Commissioner ("the Commissioner").

On appeal Skinner contends the ALJ did not obtain a valid waiver of her right to counsel and failed to adequately explain the value of her personal appearance at a hearing. She also argues that the ALJ failed to fully and fairly develop the record and erroneously concluded her impairments were not severe. We affirm. Skinner received an adequate explanation of the consequences of waiving her personal appearance in the written waiver form she signed, and any procedural irregularity in Skinner's waiver of counsel was not prejudicial. The ALJ fully and fairly developed and considered the record, and his decision is supported by substantial evidence.

## I. Background

Skinner was born in 1952 and completed her education through the eleventh grade. The record contains scant information about her work history apart from employment in the home care field from 1998 to 2000. This work involved bathing and dressing her client as well as performing household chores like cleaning, washing, cooking, and shopping. The ALJ characterized these activities, which involved stooping, kneeling, crouching, and crawling, as medium to heavy in exertional demand and unskilled in nature. Skinner stopped working in 2000 because the pay was inadequate.

Skinner's diabetes and hypertension began troubling her in February 2002, when she was treated at South Shore Hospital in Chicago for a chief complaint of dizziness. The emergency room physician diagnosed dizziness, otitis media (an infection of the middle ear), and "DM" or diabetes mellitus. A computerized tomography scan of Skinner's brain showed no abnormalities; her other exam results were normal too. She was prescribed the drug Antivert to alleviate her dizziness.

Skinner's postemergency room treatment was overseen by Dr. Teresito Arcillas from February 2002 to October 2002. Progress notes from a February 18 visit indicate Skinner was still experiencing some dizziness but nevertheless felt better, although she did report a history of polyuria (frequent urination) and polydipsia (excessive thirst). Dr. Arcillas found Skinner's heart rate normal and her lungs clear. Explaining the importance of dietary restrictions for diabetics, Dr. Arcillas placed Skinner on an 1800-calorie diet and prescribed Glipizide (a stimulant for insulin production).

At another visit one week later, Dr. Arcillas again found Skinner's heart rate regular and her lung sounds good. Skinner was ambulatory and alert, but Dr. Arcillas increased her Glipizide dosage in response to an elevated fasting blood sugar and prescribed a glucometer to monitor blood sugar. Three weeks later, Skinner was feeling better and her polydipsia had abated. Finding Skinner's fasting blood sugar still too high, Dr. Arcillas again increased her Glipizide.

On April 21, 2002, Skinner was admitted as an inpatient to South Shore Hospital with diagnoses of dizziness, diabetes mellitus Type II, and possible coronary ischemia (decreased blood supply). Tests disclosed Skinner's blood pressure was elevated, as were her glucose and cholesterol levels. An electrocardiogram revealed abnormalities

possibly indicative of ischemia. Skinner was admitted for observation and discharged the following day.

Dr. Arcillas continued to see Skinner during appointments over the next several months. At a June appointment, Dr. Arcillas prescribed Norvasc for Skinner's hypertension. The following month Dr. Arcillas prescribed Procardia to replace Norvasc as Skinner's blood pressure medication. In September 2002 Skinner reported an episode of hypoglycemia (abnormally low blood sugar) and daily headaches after taking her blood pressure pill. Her examination was normal, but Dr. Arcillas added Ecotrin (a brand-name aspirin) and nitroglycerin to Skinner's medications. In October 2002 Skinner was still reporting dizziness, lightheadedness, and headaches.

Later in October 2002, Skinner switched physicians and started seeing Dr. Sarah Glavin. Dr. Glavin's notes from October 22, 2002, identify Skinner's conditions as hypertension, diabetes, seborrheic dermatitis (a scalp skin condition treated previously by Dr. Arcillas with a special shampoo), headaches, and lightheadedness. Dr. Glavin noted Skinner complained of throbbing chest pain occurring every couple of months, though those episodes lasted only for seconds. Skinner also reported sinus pressure that increased at nighttime. Dr. Glavin's examination of Skinner's lungs, heart, nose, throat, abdomen, and neurological functioning did not reveal anything abnormal. Dr. Glavin instructed Skinner to continue her Glipizide on a new schedule, and instead of Procardia, which Skinner believed was making her weak and causing headaches, Dr. Glavin prescribed another blood pressure medication, Enalapril.

On November 14, 2002, Skinner returned to Dr. Glavin with a request that she complete paperwork for public aid assistance. Skinner initially told Dr. Glavin she had been unable to work due to the side effects of the

Procardia, but eventually acknowledged she was feeling much better and would be able to pursue employment. Dr. Glavin agreed that Skinner was capable of working despite her medical conditions.

During a December appointment, Skinner complained of fatigue over the prior month and intermittent dull headaches. Skinner told Dr. Glavin that on "bad" days these symptoms rendered her incapable of performing her daily activities. Skinner also complained of two hypoglycemic episodes, though Dr. Glavin's notes suggest that these bouts were related to Skinner's use of Glipizide without a full meal. Dr. Glavin indicated that previous blood tests were unexceptional and Skinner's lungs and heart were normal.

Three months later, in March 2003, Skinner again visited Dr. Glavin with a complaint that she had been feeling ill for three days. Skinner explained that she had awakened one morning with vertigo that lasted about fifteen minutes. On two other mornings, she experienced lightheadedness and sinus aching. Skinner also reported symptoms related to hypoglycemia, which were quickly resolved when she drank a glass of juice. Dr. Glavin suggested altering Skinner's medication to address these symptoms, but Skinner did not think it was necessary. At a subsequent visit in June 2003, Skinner reported dizziness and fleeting, intermittent pains at the top of her head. Dr. Glavin noted that all of Skinner's recent tests were normal and thought these symptoms were attributable to menopause.

Skinner filed her application for SSI benefits on April 17, 2002, while still under the care of Dr. Arcillas. In her disability report completed for the Social Security Administration ("SSA") in May 2002, Skinner identified two conditions that limited her ability to work: diabetes and high blood pressure. Though these conditions did not cause

her pain, Skinner reported that they produced constant fatigue, thirst, weight loss, and some nausea and dizziness. In a "Daily Living Questionnaire" completed in July 2002, Skinner indicated she was able to perform household chores such as cleaning, dusting, and ironing two times per week. She explained she would go out to eat or to a movie occasionally, but her activities were hampered by frequent lightheadedness. She also indicated that after standing for a prolonged period she experienced foot pain as well as leg and back fatigue. She reported these symptoms did not affect her ability to bathe or dress herself.

In August 2002 the SSA determined Skinner was not disabled. Skinner requested reconsideration of this decision. In October 2002 she submitted another Daily Activities Questionnaire, claiming she experienced pain and weakness when using kitchen utensils, writing, dressing, carrying household items like laundry and groceries, and performing personal hygiene activities including washing and combing her hair. Skinner also stated that her knees, feet, and back hurt from activities such as entering or exiting a car, standing for long periods, standing up from a sitting position, showering, and climbing stairs. Still suffering from lightheadedness and fatigue, Skinner reported she needed to rest every hour when performing household chores. These limitations, according to Skinner, prevented her from participating in activities like bowling, dining out, and going to movies.

After review by a physician and disability examiner, the SSA held that its previous determination denying benefits was proper. Skinner then requested a hearing before an ALJ, but waived her right to personally appear and agreed to have her case decided on the written record. The ALJ found that the medical records did not demonstrate any significant, disabling impairment. The ALJ identified Skinner's hypertension and diabetes as conditions that

had been and could be controlled by adherence to a prescribed medication regiment. The ALJ noted both Dr. Glavin's and Skinner's own assessments in November 2002 that she was capable of pursuing employment.

After the Appeals Council denied Skinner's request for review, she filed this action in the district court under 42 U.S.C. § 405(g) against the Commissioner of Social Security. Both parties moved for summary judgment. The district court denied Skinner's motion and entered judgment for the Commissioner. The court denied Skinner's subsequent motion to alter or amend the judgment.

## II. Discussion

Our review of the district court's grant of summary judgment is de novo, *see Groves v. Apfel*, 148 F.3d 809, 811 (7th Cir. 1998), but we apply a deferential standard of review when assessing the ALJ's decision, *see Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). We review the ALJ's decision to see if it is supported by "substantial evidence," *see* 42 U.S.C. § 405(g), which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted). Substantial evidence must be more than a scintilla but may be less than a preponderance. *Id.*; *Bunge Corp. v. Carlisle*, 227 F.3d 934, 937 (7th Cir. 2000). When reviewing for substantial evidence, we do not displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003).

Skinner's primary argument on appeal concerns claimed procedural defects in the SSA's administrative proceedings. First, Skinner claims the ALJ failed to obtain a valid waiver of counsel. An SSI applicant's right to be

represented by counsel at a disability hearing is statutory, *see* 42 U.S.C. § 406; *Nelson v. Apfel*, 131 F.3d 1228, 1231 n.1 (7th Cir. 1997); *Binion v. Shalala*, 13 F.3d 243, 244 (7th Cir. 1994); *Thompson v. Sullivan*, 933 F.2d 581, 584-85 (7th Cir. 1991); 20 C.F.R. § 404.1700, but the right may be waived, *see Thompson*, 933 F.2d at 584. To ensure valid waivers, ALJs must explain to pro se claimants "(1) the manner in which an attorney can aid in the proceedings, (2) the possibility of free counsel or a contingency arrangement, and (3) the limitation on attorney fees to 25 percent of past due benefits and required court approval of the fees." *Binion*, 13 F.3d at 245; *Thompson*, 933 F.2d at 584. Skinner contends the ALJ did not inform her of the advantages of representation by counsel or the cap on attorney's fees. The Commissioner concedes as much, acknowledging that the written notices provided to Skinner do not comport with this circuit's requirements for establishing a valid waiver. The Commissioner asserts, however, that the error was harmless, and we agree.

The ALJ's failure to obtain a valid waiver of counsel heightens his duty to develop the record. *Luna v. Shalala*, 22 F.3d 687, 692 (7th Cir. 1994); *Thompson*, 933 F.2d at 585-86*; Smith v. Sec. of Health, Educ. & Welfare*, 587 F.2d 857, 860 (7th Cir. 1978). When an ALJ fails to adequately inform an unrepresented claimant of the right to counsel, the ALJ must "scrupulously and conscientiously probe into, inquire of, and explore for all relevant facts." *Smith*, 587 F.2d at 860 (citation omitted); *Binion*, 13 F.3d at 244; *Nelson*, 131 F.3d at 1235. If the ALJ does not obtain a valid waiver of counsel, the burden is on the Commissioner to show the ALJ adequately developed the record. *Binion*, 13 F.3d at 245. While a claimant represented by counsel is presumed to have made his best case before the ALJ, no such presumption attaches to an unrepresented claimant. *Sears v. Bowen*, 840 F.2d 394, 402 (7th Cir. 1987).

Skinner argues that the ALJ failed to fully and fairly develop the record in that she did not receive a proper explanation of the significance of appearing in person at an oral hearing and the possible consequences of waiving her personal appearance and allowing the case to be decided on the written record. However, Skinner signed a waiver-of-appearance form containing the explanations Skinner now claims were omitted. "Waiver Form HA-4608," which Skinner acknowledges she signed, provides:

> I have been advised of my right to appear in person before an [ALJ]. I understand that my personal appearance before an [ALJ] would provide me with the opportunity to present written evidence, my testimony, and the testimony of other witnesses. I understand that this opportunity to be seen and heard could be helpful to the [ALJ] in making a decision.
>
> Although my right to a personal appearance before an [ALJ] has been explained to me, I do not want to appear in person. I want to have my case decided on the written evidence.

Form 4608 also explains that a claimant who chooses not to appear in person may "enter written statements about the facts and law material to [the] case" and may at any time before the ALJ's decision is mailed withdraw the waiver and request a personal appearance.

Skinner also previously received a separate notice informing her of her right to appeal the disposition of her request for reconsideration. That form explains:

> The hearing proceedings are informal. The [ALJ] will summarize the facts in your case, explain the law, and state what must be decided. Then you will have an opportunity to explain why you disagree with the decision made in your case, to present additional

evidence and to have witnesses testify for you. You can also request the [ALJ] to subpoena unwilling witnesses to appear for cross-examination and to bring with them any information about your case. You have the right to request the [ALJ] to issue a decision based on the written record without you personally appearing before him/her. If you decide not to appear at the hearing, you still have the right to submit additional evidence. The administrative law judge will base the decision on the evidence in your file plus any new evidence submitted.

Skinner does not clearly explain why she thinks the waiver form and the Commissioner's notice of her rights on appeal were insufficient. She suggests that the ALJ should have advised her of the possibility of appearing by video teleconference, as well as the possibility that her appearance might prove "essential" to her claim. These contentions are without merit.

ALJs are not required to inform every applicant of the possibility of appearing by video teleconference. Skinner cites 20 C.F.R. § 416.1429, which *permits* an applicant to appear via video teleconference at a disability hearing. § 416.1429 ("At the hearing you may appear in person or by video teleconferencing . . . ."). However, the ALJ has discretion to determine when an applicant's circumstances warrant appearance by video teleconference rather than in person. *See* 20 C.F.R. § 416.1436(c) ("[T]he administrative law judge determines whether your appearance . . . will be made in person or by video teleconferencing."). Nothing in the record suggests Skinner desired to personally appear but was incapable of doing so such that a video teleconference might have been considered.

Skinner also claims that she was not properly apprised of the value of personally appearing at a hearing. Citing

Social Security Ruling 79-19, she argues that the ALJ did not inform her that her appearance could be "essential" to the ALJ's evaluation of her case. Social Security Ruling 79-19 provides: "The individual must also be advised of the value of personal appearance at a hearing. It should be made clear that, in some cases, additional evidence obtained at the hearing, particularly through personal appearance and/or oral testimony, may be essential to the proper evaluation of the factors at issue." That same ruling explains that a waiver document must show that the waiving party understands that "additional evidence obtained through oral testimony and personal presence before the presiding officer may be of value in evaluating the issues." SSR 79-19, 1979 WL 15541, at *3 (S.S.A.).

We need not attempt to reconcile SSR 79-19's references to evidence that "may be of value" and evidence that "may be essential" in describing the sort of explanation the ALJ must provide before accepting an appearance waiver. The waiver form that Skinner signed—Waiver Form HA-4608, which we have quoted above—generally comports with the ruling's requirements. It explains that a personal appearance would provide the claimant the opportunity to present written evidence and testimony and would permit the claimant to be "seen and heard," which "could be helpful" to the ALJ in making a decision. This explanation properly informed Skinner of the potential benefits of personally appearing at an oral hearing. Our conclusion in this regard is consistent with a recent decision of the Sixth Circuit, which held that Waiver Form 4608 is consistent with the requirements of SSR 79-19. *See Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 489-90 (6th Cir. 2006).

Apart from the claimed deficiencies of waivers and notices, Skinner argues that the ALJ failed to adequately develop the record in that he failed to obtain more de-

tailed information from Dr. Glavin and/or failed to obtain a consultative examination or a medical source statement ("MSS"). An MSS explains what an individual can do despite severe impairments, "in particular . . . an individual's physical or mental abilities to perform work-related activities on a sustained basis." SSR 96-5p, 1996 WL 374183, at *4 (S.S.A. July 2, 1996); *see also* 20 C.F.R. § 416.919n. ALJs may contact treating physicians for further information when the information already in the record is "inadequate" to make a determination of disability, though "[a]djudicators are generally required to request that acceptable medical sources provide [MSSs] with their medical reports." SSR 96-5p, 1996 WL 374183, at *4 (S.S.A. July 2, 1996); 20 C.F.R. § 416.912(e).

Skinner contends the ALJ should have contacted Dr. Glavin to "clear up" whether Skinner was capable of working after discontinuing her use of Procardia in November 2002. Dr. Glavin's notes suggest a link between certain of Skinner's symptoms and her use of Procardia, and Skinner herself told the doctor that her headaches and lightheadedness occurred only when she took the medicine. At subsequent visits during the period when Skinner was no longer taking the drug, she reported these same symptoms, but Dr. Glavin characterized them as "fleeting" or "intermittent." By March 2003 Skinner displayed more isolated symptoms, which Dr. Glavin did not find attributable to Skinner's diabetes or high blood pressure. Furthermore, it was after Skinner stopped taking Procardia that Dr. Glavin opined she was capable of working—an assessment in which Skinner concurred. The record contained adequate information for the ALJ to render a decision; his decision not to obtain an MSS or further information from Dr. Glavin did not render the record incomplete.

Skinner also thinks the ALJ should have ordered a consultative examination. The ALJ is not *required* to order

such examinations, but may do so if an applicant's medical evidence about a claimed impairment is insufficient. *See* 20 C.F.R. §§ 416.912(f), 416.917. In support of her position, Skinner quotes the ALJ's opinion, which notes the "very limited objective medical evidence" of disability. Skinner believes this statement reflects the ALJ's recognition of the need for additional evidence. Skinner misconstrues this comment. The ALJ was highlighting the lack of objective medical data to support Skinner's claimed disability and the predominance in the record of Skinner's own subjective complaints; he was not commenting on a gap in the medical evidence that a consultative examination would have filled. The ALJ was not required to order a consultative examination in order to adequately develop the record.

This leaves Skinner's final argument that the ALJ failed to appreciate the severity of her condition. Skinner contends the ALJ improperly found, at step two of the five-step disability analysis, that Skinner's impairments were not severe.[1] *See Dixon*, 270 F.3d at 1176; 20 C.F.R.

---

[1] As we explained in *Henderson v. Apfel*:

Under the five-step process, the ALJ considers first whether the claimant is engaged in a "substantial gainful activity." 20 C.F.R. § 404.1520(b). If not, the ALJ considers whether the claimant has an impairment or combination of impairments that "significantly limits [the claimant's] physical or mental ability to do basic work activities." *Id.* § 404.1520(c). If so, the ALJ determines whether the impairment meets or equals any of the Listings found in the regulations. *See id.* pt. 404, subpt. P, app. 1. If the claimant's impairment is found to meet or equal one of the Listings, the claimant is deemed disabled. *See id.* § 404.1520(d). If not, the ALJ determines the claimant's residual functional capacity. If the ALJ finds that the claimant's residual functional

(continued...)

§ 416.920(a)(4). More specifically, she argues the ALJ did not consider the effects of her ailments in the aggregate. Skinner is correct that such a failure may constitute legal error. *See Barrett v. Barnhart*, 355 F.3d 1065, 1068 (7th Cir. 2004). Under the applicable disability analysis, a claimant will be found to be disabled if she shows the existence of a medically determinable physical or mental impairment that will last at least twelve months or result in death. 42 U.S.C. § 1382c(a)(3)(A)-(B). The impairment is disabling if it renders the claimant unable to engage in substantial gainful activity. *Id.*; *Barnhart v. Walton*, 535 U.S. 212, 217-22 (2002).

Skinner believes that she readily meets these criteria, as evidenced by her limitations in walking, standing, sitting, and reaching. But Skinner implicitly acknowledges that the objective medical record does not confirm her claim of disabling symptoms. She argues that her symptoms are reasonably related to her diagnoses of diabetes and hypertension. That may be true, but the existence of these diagnoses and symptoms does not mean the ALJ was required to find that Skinner suffered disabling impairments. Contrary to any claim of severity, the ALJ concluded that at best Skinner had demonstrated nondisabling symptoms, and the record medical evidence established that those symptoms are largely controlled with proper medication and treatment. *See Barrientos v.*

---

[1] (...continued)
capacity does not allow the claimant to perform past relevant work, the burden shifts to the Social Security Administration to prove that in light of the claimant's age, education, job experience and functional capacity to work, the claimant is capable of performing other work and that such work exists in the national economy. *See Stein v. Sullivan*, 892 F.2d 43, 44 n.1 (7th Cir. 1990).

179 F.3d 507, 512 n.3 (7th Cir. 1999).

*Sec'y of Health & Human Servs.*, 820 F.2d 1, 2 (1st Cir. 1987); *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988).

The ALJ did not disregard the totality of Skinner's claimed symptoms. He evaluated her claims against the medical evidence in the record to determine whether her impairments were severe. He considered not only Dr. Glavin's assessments, but that of the state agency physicians as well and also Skinner's own representations. The ALJ's decision specifically states that "the claimant does not have an impairment, *or combination of impairments,* that would have more than a minimal effect on her ability to work." (Emphasis added.)

For the foregoing reasons, we conclude that the ALJ's decision was supported by substantial evidence. Skinner's waiver of her personal appearance was valid, and the procedural error in her waiver of counsel was not prejudicial.

AFFIRMED.

A true Copy:

     Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*