In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-1774

THEODIS NELMS, JR.,

*Plaintiff-Appellant,*

*v.*

MICHAEL J. ASTRUE,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 2:06-cv-00273-CNC—**Charles N. Clevert, Jr.**, *Judge.*

ARGUED OCTOBER 16, 2008—DECIDED JANUARY 28, 2009

Before RIPPLE, EVANS, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Theodis Nelms, Jr., sought Social Security disability benefits, but an administrative law judge determined that he can perform light work. On appeal Nelms, who was without counsel before the ALJ, contends that the ALJ did not adequately develop the record in violation of his duty to unrepresented claimants. Additionally, Nelms argues that the ALJ ignored certain environmental restrictions when assessing Nelms's resid-

ual functional capacity. We agree with Nelms that the record is inadequate and therefore remand for further proceedings before the agency.

## Background

Nelms applied for Supplemental Security Income benefits in June 2002. He listed as impairments pneumonia, recovery from open-heart surgery, and asthma. In his application Nelms wrote, "If I walk, lift or do anything too strenuous I get out of breath." After the Social Security Administration twice denied his application, Nelms requested a hearing.

### A. Hearing

Nelms appeared at his hearing in June 2005 without counsel. After a few questions about Nelms's work history, the ALJ addressed the possibility of representation, explaining that "I don't give somebody credit just because they have an attorney"; still, the ALJ continued, the Social Security Administration believes "that having an attorney is a good idea." The ALJ explained the role of an attorney but also noted the ALJ's independent duty to create a record:

> I think the thinking must be that an attorney can talk to you, keep you company at the hearing, ask additional questions when I'm done, look over your file, see if it looks reasonably complete and so on. It looks pretty complete. You've brought in

> additional information here and so on. We do
> much of that anyway.

After the ALJ described the costs typically associated with an attorney in the Social Security setting, Nelms replied, "I'd rather talk to you."

Proceeding with the hearing, the ALJ asked Nelms to rank his medical problems. Nelms stated that his heart was the worst, followed by his back, his legs, and his asthma, in that order. Regarding his heart Nelms explained, "I have shortness of the breath and, you know, that also happen[s] with asthma and plus they cut me open. I got a stent in my heart, you know." Nelms described an inability to sleep at night because of severe pain, which he believes to be the onset of arthritis. Nelms also reported that his doctor had prescribed Methadone to alleviate the pain in his back and in his legs, although the medication was "not helping that much." Nelms testified, moreover, that he experiences soreness in his lower back "[a]ll day every day," with a brief respite only immediately after taking the medication. As for his respiratory problems, Nelms mentioned that his asthma strikes when he is near dust or pollen outside and when he is hot or cold. Nevertheless, Nelms exercises and walks every day per his doctor's instructions, albeit with limitations. "I can walk probably about a good two blocks before I really get messed up," Nelms testified, "but here lately, you know, since I've been hurting, you know, I can't walk half a block." Furthermore, Nelms stated that since surgery he has done "little odd jobs," including raking leaves and shoveling snow. Nelms described his

daily activities in detail—how each morning he cooks himself breakfast, cleans up, goes for a walk, does laundry, and, later, perhaps goes to the grocery store with his step-mother before cooking himself dinner. Although Nelms "used to party a lot," he testified that his drinking is down to two or three beers each day and he is generally home by 9:00 p.m.

After approximately twenty minutes of questioning, the ALJ remarked, "I can't think of anything else to ask. Anything else I should know?" Nelms clarified a few points about his education and work history, and with that the hearing ended.

### B. Medical Evidence

In May 2002 Nelms was admitted to a hospital in Milwaukee, Wisconsin, after he was found unresponsive in his home. He was diagnosed with pneumonia, respiratory failure, overheating (hyperthermia), inflammation of the heart (endocarditis), delirium likely caused by alcohol withdrawal (delirium tremens), an abnormally low concentration of sodium in the blood (hyponatremia), and low blood pressure (hypotension). During his hospital stay, Nelms's doctors replaced his mitral valve (a heart valve) with a mechanical substitute, and the surgery was a success. Nelms was discharged from the hospital in June 2002.

Over the next four months Nelms attended cardiopulmonary rehabilitation sessions, where he would walk on a treadmill, lift weights, and ride a stationary

bicycle. The parties agree that "Mr. Nelms generally tolerated the exercises well."

In December 2002 Dr. Patricia Chan, a non-examining state-agency physician, assessed Nelms's residual functional capacity. Dr. Chan opined that Nelms could perform the lifting, sitting, and standing exertions associated with light work.

Nelms was hospitalized again in March 2003—this time for intra-abdominal bleeding, over-anticoagulation, and kidney failure (renal insufficiency) resulting from a mixture of alcohol and prescription anticoagulants. He was discharged one week later with instructions to abstain from alcohol and "not to double dose."

Five months later Dr. Robert Callear, another non-examining state-agency physician, assessed Nelms's residual functional capacity. Like Dr. Chan, Dr. Callear concluded that Nelms could perform the duties associated with light work. Dr. Callear did note, however, that Nelms should avoid concentrated exposure to fumes, odors, dust, gases, and poor ventilation.

From 2002 to 2003 Nelms met with a number of other doctors, often to seek pain relief or for check-ups related to his surgery. Of those visits, two appear to be significant. In April 2003 Dr. Ijaz Malik reported that Nelms was not yet ready to return to work following several episodes of internal bleeding. And in May 2003 Dr. Marcin Turecki prescribed a stronger prescription pain medication when Tylenol proved insufficient to treat Nelms's back pain.

The record is silent on Nelms's condition from mid-2003 to 2005 (his hearing date) with one exception—a four-line report from Nelms's primary-care physician, Dr. Pablo Bozovich, dated April 2005. Dr. Bozovich wrote that Nelms's condition is "stable" with respect to his mitral-valve replacement. Furthermore, Dr. Bozovich noted, Nelms suffers from mild spinal stenosis and chronic back pain, but his pain is "controlled w/ oral medication," and his asthma is stable as well.

## C. ALJ Decision

The ALJ began his written decision by acknowledging that Nelms had not engaged in substantial gainful activity since his alleged onset date. Still, the ALJ noted that Nelms's heart surgery went "beautifully well," that his rehabilitation indicated a smooth recovery, and that his complaints of debilitating pain were sporadic. According to the ALJ, the medical record documented steady improvement since Nelms's hospitalization in 2002:

> [The record] paints a picture of a bad medical episode in the Spring of 2002, which lasted much less than a year. It also paints a picture of recovered capacity for work even with the continued substance abuse and paints a picture of a situation well within the scope of the light capacity vocational rules. It also shows strong causal contributions of substance abuse to the claimant's reduced condition but not anything like a disabling condition even with the substance abuse. More than that,

the record shows that, were the claimant not to drink and not to smoke, to follow a better diet, and to use his medicines as prescribed, his capacity might even approach full medium exertional levels.

The ALJ compared the favorable reports of Drs. Chan and Callear with the lesser capacity alleged by Nelms but discounted Nelms's testimony because "he is not very credible." Nelms's testimony regarding his symptoms was unconvincing and inconsistent, the ALJ wrote. According to the ALJ, Nelms's resistance to medical advice and his continued drinking—however reduced—also undermined his claim.

Ultimately the ALJ agreed with Nelms that his heart condition, his asthma, his alcohol abuse, and his back pain are severe impairments—but these impairments do not, according to the ALJ, meet or otherwise equal a listed impairment. Next the ALJ found that Nelms cannot perform any of his past relevant work, which was "medium or greater in exertional demands and had other demands." But, the ALJ continued, Nelms retains the residual functional capacity "for a full range or nearly full range of light jobs and for some medium jobs at the exertionally lower end of the medium range."

The ALJ concluded that Nelms's asthma does not prevent him from light work because it is "slight" and not a "significant environmental impairment." Nelms listed his asthma as the least significant of his impairments. And it is not a new problem, according to the ALJ, nor did it prevent Nelms from working in the past. The ALJ

did, however, acknowledge that heat and some outdoor conditions can aggravate Nelms's condition. "[E]ven if the claimant should avoid outdoor work on warm, humid days or avoid work in hot work places," the ALJ wrote, "nevertheless the sedentary and light categories of work contain great numbers of jobs and many occupational opportunities still open to the claimant." Thus, the ALJ found that Nelms is not disabled on account of his ability to perform light work found in the national economy.

The Appeals Council denied Nelms's subsequent request for review. The district court affirmed the decision of the Commissioner.

## Analysis

If the Appeals Council denies a request for review, as it did here, the ALJ's decision becomes the final decision of the Commissioner of Social Security. *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008). This court will reverse an ALJ's denial of disability benefits only if the decision is not supported by substantial evidence or is based on an error of law. 42 U.S.C. § 405(g); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007); *Rice v. Barnhart*, 384 F.3d 363, 368-69 (7th Cir. 2004). Substantial evidence includes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation and quotation marks omitted); *see Getch*, 539 F.3d at 480.

Nelms first asserts that the ALJ did not adequately develop the record—an obligation that was heightened by

Nelms's decision to proceed without counsel. In particular Nelms takes issue with the absence, save for Dr. Bozovich's note, of any medical records from mid-2003 to 2005—a period in which, Nelms argues, some of his impairments worsened. Medical documents from that period, Nelms contends, attest to severe degenerative changes in Nelms's back and hips and "strongly support" a finding of disability. Nelms also points to the length of the hearing—25 minutes—as further proof that the ALJ did not fully and fairly develop the record in this case.

While a claimant bears the burden of proving disability, the ALJ in a Social Security hearing has a duty to develop a full and fair record. *See Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000); *Thompson v. Sullivan*, 933 F.2d 581, 585 (7th Cir. 1991). This duty is enhanced when a claimant appears without counsel; then the ALJ must " 'scrupulously and conscientiously [ ] probe into, inquire of, and explore for all the relevant facts.' " *Thompson*, 933 F.2d at 585-86 (quoting *Smith v. Sec. of Health, Educ. & Welfare*, 587 F.2d 857, 860 (7th Cir. 1978)); *see Nelson v. Apfel*, 131 F.3d 1228, 1235 (7th Cir. 1997). Although pro se litigants must furnish some medical evidence to support their claim, *see Johnson v. Barnhart*, 449 F.3d 804, 808 (7th Cir. 2006), the ALJ is required to supplement the record, as necessary, by asking detailed questions, ordering additional examinations, and contacting treating physicians and medical sources to request additional records and information. 20 C.F.R. §§ 416.912(d)-(f), 416.919, 416.927(c)(3); *see Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003) (holding 700-page record inadequate because it lacked detail about certain impairments); *Thompson*, 933 F.2d at 587.

This court generally upholds the reasoned judgment of the Commissioner on how much evidence to gather, even when the claimant lacks representation. *See Luna v. Shalala*, 22 F.3d 687, 692 (7th Cir. 1994); *Binion v. Shalala*, 13 F.3d 243, 246 (7th Cir. 1994). Accordingly, "a significant omission is usually required before this court will find that the [Commissioner] failed to assist *pro se* claimants in developing the record fully and fairly." *Luna*, 22 F.3d at 692. And an omission is significant only if it is prejudicial. *See Nelson*, 131 F.3d at 1235. "Mere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant a remand." *Binion*, 13 F.3d at 246. Instead a claimant must set forth specific, relevant facts—such as medical evidence—that the ALJ did not consider. *Nelson*, 131 F.3d at 1235; *see Binion*, 13 F.3d at 245 ("Prejudice may be demonstrated by showing that the ALJ failed to elicit all of the relevant information from the claimant."); *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982) (significant gaps in the record may preclude a fair and adequate hearing).

Nelms argues that the two-year evidentiary gap is a significant omission, and we agree. Nelms filed, in this court, a separate appendix of medical records from 2003, 2004, and 2005 for the limited purpose of demonstrating prejudice. That appendix contains various examination reports and diagnoses from the same Wisconsin hospital where Nelms had his surgery. The documents, moreover, support Nelms's theory that the ALJ likely would have

found Nelms disabled had he considered them[1]—or even if he had simply asked more questions about recent developments. *See Binion*, 13 F.3d at 246. For example, a CT scan in January 2004 revealed, for the first time, degeneration of Nelms's thoracic and lumbar spine with a "diffuse disk bulge" and "posterior spurring." Although subsequent notes convey that Nelms "has good control [of his back pain] with Ultran 50 mg once daily as needed" and "this pain is getting better," Nelms later reported that "[i]t is worse when [he] sits and gets better when he stands up." And by February 2005, Nelms's back pain was acute, "especially when he stands up. He feels weak, especially when he has to do that. . . . This is due to disc disease." Moreover, Nelms began to experience a limited range of motion in his hips sometime in 2004, which turned out to be from "[s]evere degenerative changes of both hips." An examination revealed "severe joint space narrowing, along with spurring of the femoral head" in Nelms's left hip, as well as "marked joint space narrowing, along with femoral spurring" in Nelms's right hip.

---

[1] The government accuses Nelms of "selectively omitt[ing]" some medical evidence from 2003 to 2005 that suggests that his back pain was manageable (with medication). But that charge is baseless, and it misses the point. Nelms does not purport to enter new evidence into the record at this stage; rather, he furnishes just enough evidence to establish that the ALJ did not fulfill his duty to create a fair and full record—one that will include both favorable and unfavorable information once complete.

These are precisely the sort of specific, relevant facts that an ALJ is expected to consider when determining disability in a pro se claimant. *See Binion*, 13 F.3d at 246. No doubt a "complete" record is always elusive, *see Johnson*, 449 F.3d at 808; *Luna*, 22 F.3d at 692; *Kendrick v. Shalala*, 998 F.2d 455, 456-57 (7th Cir. 1993), and there is no absolute requirement that an ALJ update the medical records to the time of the hearing, *see Luna*, 22 F.3d at 692-93. But here the ALJ was aware that Nelms was still receiving treatment in 2005 and that his back pain was severe and continuing. His leg pain persisted as well. Yet the ALJ did not probe, in any depth, Nelms's recent past at the hearing or gather *any* medical evidence to fill the two-year gap in the record. Had the ALJ done so, he would have uncovered documentation of orthopedic decline. This is particularly troubling in light of the ALJ's assurances that he would independently assemble a "reasonably complete" record. Unlike in previous cases, this was not a "marginal hearing" that nevertheless provided "a fairly complete picture" of Nelms's impairments. *See Nelson*, 131 F.3d at 1236. Nor was it a situation in which an unrepresented claimant reassured the ALJ that no additional medical records exist. *See Johnson*, 449 F.3d at 808. Thus, we cannot say that the ALJ adequately developed the record.

There is a secondary matter that also deserves comment. Nelms also argues that the ALJ did not consider the combined effects of Nelms's impairments when determining disability. He asserts in his brief, "it was illogical for the ALJ to on one hand find Plaintiff's asthma was a severe impairment, but on the other hand, include no symptoms or limitations related to asthma in Plaintiff's

RFC." Nelms insists further that "the ALJ included no environmental restrictions in[ ] Plaintiff's residual functional capacity assessment." But the ALJ's opinion devotes considerable attention to Nelms's respiratory limitations—and concludes that "even if the claimant should avoid outdoor work on warm, humid days or avoid work in hot work places, nevertheless the sedentary and light categories of work contain great numbers of jobs and many occupational opportunities still open to the claimant." To this Nelms offers essentially two responses: first, that the ALJ should have explicitly addressed his need to avoid concentrated exposure to dust, pollen, fumes, odors, and gases, and second, that the ALJ could not assume that such jobs exist without the assistance of a vocational expert.

Nelms's arguments on this point are unpersuasive. The ALJ pressed Nelms on his environmental restrictions at length—and Nelms himself emphasized that his asthma manifests when he is exposed to dust and pollen outside. When it does, Nelms overheats, and his solution is to go inside. The ALJ's discussion of restrictions on outside work in warm environments speaks directly to these respiratory limitations, and it is clear from the record that the ALJ considered Nelms's environmental restrictions in tandem with his other impairments. *See Getch*, 539 F.3d at 481 (ALJ does not have to provide complete written evaluation of every piece of testimony and evidence).

Nelms cites *Warmoth v. Bowen*, 798 F.2d 1109 (7th Cir. 1986), in support of his argument that a vocational expert was needed. In *Warmoth* this court rejected an ALJ's

conclusory determination that most sedentary jobs do not expose workers to *any* environmental irritants. *Id.* at 1110. After an accident in which an industrial machine spilled toxic chemicals on his face, Warmoth was unable to tolerate even the slightest amount of second-hand smoke or perfume. *Id.* at 1110-11. Notably, though, this court did not require that the ALJ consult a vocational expert on remand: "we only require that there be reliable evidence of some kind that would persuade a reasonable person that the limitations in question do not significantly diminish the employment opportunities otherwise available." *Id.* at 1112; *see also* 20 C.F.R. § 416.966(e); *Binion*, 13 F.3d at 246 (explaining that use of a vocational expert is discretionary).

This case is not so severe. In essence the ALJ assumed that some light work exists in the national economy that does not present a threat of *concentrated* exposure to dust, pollen, fumes, gases, odors, or poor ventilation. Of course, a vocational expert would be uniquely qualified to answer this question—and the ALJ may wish to enlist one on remand—but the ALJ's assumption alone is not so outlandish as to warrant reversal. *See Luna*, 22 F.3d at 691 ("this court has said that in cases where a non-exertional limitation might *substantially* reduce a range of work an individual can perform, the ALJ must consult a vocational expert.") (emphasis added); Social Security Ruling 85-15, 1985 WL 56857, at *8 (Nov. 30, 1984) ("Where a person has a medical restriction to avoid *excessive* amounts of noise, dust, etc., the impact on the broad world of work would be minimal because most job environments do not involve great noise, amounts of dust, etc.") (emphasis added).

So, although the ALJ's treatment of the combined effects of Nelm's impairments does not justify reversal, his failure to develop the record as discussed above does. Therefore, because substantial evidence does not support the ALJ's decision, we REVERSE the judgment of the district court and REMAND for further proceedings before the agency.

RIPPLE, *Circuit Judge*, concurring. I am pleased to join the judgment and the comprehensive opinion of the court. I write separately simply to underline the inherent unfairness in the ALJ's having assured Mr. Nelms that the judge had an independent responsibility to develop the record and then leaving such a wide gap in the development of the relevant medical history.

Although the cold record is difficult to assess on this matter, I am concerned here that the ALJ's colloquy with Mr. Nelms may well have had the unintentional effect of dissuading him from retaining counsel. An ALJ must be very circumspect, and even-handed, in his advice to a litigant and, here, Mr. Nelms may well have interpreted the ALJ's advice as expressing the ALJ's personal view that no attorney was needed.