NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit
Chicago, Illinois 60604**

Submitted September 16, 2009[*]
Decided September 23, 2009

**Before**

JOEL M. FLAUM, *Circuit Judge*

TERENCE T. EVANS, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

No. 09-1741

| | |
|---|---|
| ANTHONY C. MARTIN, | Appeal from the United States District |
| *Plaintiff-Appellant*, | Court for the Northern District of |
| | Indiana, Fort Wayne Division. |
| *v.* | |
| | No. 08-CV-46 |
| MICHAEL J. ASTRUE, | |
| Commissioner of Social Security, | Roger B. Cosbey, |
| *Defendant-Appellee*. | *Magistrate Judge*. |

**O R D E R**

Anthony Martin applied for Supplemental Security Income, claiming that he is unable to work because of the lasting effects of multiple gunshot wounds and post-traumatic stress disorder ("PTSD"). An administrative law judge ("ALJ") concluded that these severe impairments do not prevent Martin from performing a significant number

---

[*]After examining the briefs and the record, we have concluded that oral argument is unnecessary. Thus, the appeal is submitted on the briefs and the record. *See* FED. R. APP. P. 34(a)(2).

of jobs involving light, unskilled work. Martin sought review in the district court, arguing that the ALJ failed to adequately develop the record and was prejudiced against him. A magistrate judge, presiding by consent, rejected Martin's contentions, and Martin now appeals to this court. We affirm the judgment.

At the time of the administrative hearing in 2007, Martin was 27 years old, had obtained his GED, and had last worked in a warehouse for several months in 2000. In April 2003 Martin was shot 14 times in his abdomen, lower back, and legs. As a result of his injuries, he suffers from PTSD, has difficulty standing for long periods, and experiences back pain and numbness in his right leg. Martin filed his first application for benefits in July 2003, which the Social Security Administration ("SSA") denied later that year. He did not appeal that decision, but in November 2004 he filed a second application alleging a disability onset date of April 14, 2003, the date of his shooting, and claiming that his injuries from the gunshot wounds and his PTSD prevent him from working.

In evaluating Martin's claim, the SSA obtained records from his treating physicians and several consulting physicians. Records from Parkview Hospital in Fort Wayne, Indiana, show that Martin was treated in April 2003 for multiple gunshot wounds. In addition to the numerous wounds to his lower body, he suffered a liver laceration and, after surgery, was left with two bullets embedded in his lower back. Martin attended physical therapy at the Parkview Rehab Outpatient Clinic, where, three months after the shooting, his therapist noted that he did "not appear to have functional limitations, which would prevent him from searching [for] gainful employment." In February 2005 Martin was again rushed to the emergency room at Parkview Hospital after a second shooting in which he was wounded in his left arm, left leg, and abdomen. Dr. Craig Marks surgically repaired new injuries to Martin's diaphragm, colon, stomach, and liver, and continued to treat him in the following months for abdominal pain. Dr. Marks prescribed physical therapy in April 2005, and in September of that year, he referred Martin to Dr. Nikola Nenadovich, an orthopedic specialist. Dr. Nenadovich saw Martin twice before the end of 2005 and prescribed an anti-inflammatory and home exercises.

During the SSA's review of Martin's inital application for benefits, he was referred to Dr. Barbara Gelder for a psychiatric exam in September 2003. Dr. Gelder diagnosed Martin with PTSD, recurrent major depression, alcohol abuse, and possible marijuana abuse. Dr. Gelder evaluated Martin again in January 2005 and once more diagnosed PTSD as well as a pain disorder due to physical and psychological factors. She ruled out a mental handicap but assigned him a score of 43 on the Global Assessment of Functioning scale, reflecting serious symptoms of mental illness or serious impairment in social functioning. *See* AM. PSYCHIATRIC ASS'N, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 30-32 (4th ed. 1994). Martin also participated in outpatient counseling for drug and alcohol

dependency at Bowen Center in 2003, and in December 2004 he was evaluated at Park Center, where he was diagnosed with cocaine and alcohol dependency in full remission, cannabis dependency, and pathological gambling.

In March 2005 Martin was also examined by three state-agency physicians to assess his residual functional capacity ("RFC"). Two doctors evaluated Martin's physical RFC. Dr. Yaroslav Pogorelov concluded that Martin has difficulty sitting, standing, walking, and lifting due to abdominal and lower-back pain as well as nerve damage to his right leg and left arm. The physician opined that Martin would not be able to stand or walk for even two hours in an eight-hour day and noted also that he suffers from PTSD. Dr. T. Crawford concluded that Martin's physical limitations, including a difficulty with fine-fingering manipulation, prevent him from climbing ladders, ropes, and scaffolds but do not preclude light work involving occasional postural activities. Finally, Dr. B. R. Horton, who assessed Martin's mental RFC, concluded that he can perform simple repetitive tasks but is moderately limited in concentrating, understanding, and remembering detailed instructions.

The SSA denied Martin's application initially and upon reconsideration. Martin requested that an ALJ take a fresh look at his claim, and a hearing was scheduled for September 2007. Just prior to the hearing, in July 2007, the ALJ requested updated records from Parkview Hospital and Dr. Marks. Those requests yielded records from treatment through the end of 2005, including Dr. Nenadovich's progress notes that were in the possession of Dr. Marks.

At the hearing both Martin, who appeared pro se, and a vocational expert ("VE") testified. The ALJ began by advising Martin that he could benefit from having a representative and explaining that a representative could receive payment only on a contingency basis and then only with the approval of the ALJ. Martin confirmed that he received a referral list for legal representation and declared that he wished to proceed without a representative. The ALJ then asked Martin if there were any new documents relevant to his claim. Martin answered that there were records from 2005 to the present from Parkview Hospital[1], Dr. Nenadovich, and Park Center. Although he first testified that he had undergone an additional surgery at Parkview Hospital in late 2006 when the gunshot wound in his stomach had become infected, he stated later in the hearing that the

---

[1]In his testimony Martin referred to Parkview Hospital by its former name, Parkview Memorial Hospital. For clarity we have used the current name. *See* Indiana Historical Society, Parkview Hospital 3 http://www3.indianahistory.org/HBR/ business_pdf/parkview_hospital.pdf (last visited Sept. 1, 2009).

surgery was performed at Parkview North Hospital, a different facility within the Parkview Health system, *see* Parkview Health, http://www.parkview.com/Locations/ Pages/ default.aspx (last visited Sept. 1, 2009). The ALJ probed him about his daily activities, educational and employment background, medical history, and specific physical and mental limitations, including his complaints of pain and anxiety. Martin testified that he has nerve damage in his left leg and hand. He said that standing causes his leg to go cold and numb, and moving causes pain in his back and legs that is unbearable on cold or rainy days. He has difficulty climbing stairs, he said, but conceded that his use of a cane to walk is infrequent. Martin added that he is in constant stress from the shootings and does not often leave his house.

After Martin testified, the ALJ asked the VE to consider a hypothetical person with Martin's age, education, and work history who could perform light work with the ability to sit or stand at will but could not be exposed to dampness or temperature extremes. This hypothetical person, the ALJ added, would have only limited use of the fingers of the nondominant left hand and could not lift or carry more than ten pounds with that hand. Climbing of ladders, ropes, or scaffolds would be precluded, and only occasional balancing, stooping, kneeling, crouching, crawling, or climbing of ramps and stairs would be allowed. The ALJ also limited the individual to simple, routine, and repetitive tasks consistent with unskilled work; ruled out contact with the general public and jobs involving more than brief interactions with others; precluded jobs in fast-paced environments or with strict production requirements; and narrowed the permissible employment to positions requiring only simple work-related decisions and few workplace changes. The VE responded that a person with these limitations still could perform a significant number of jobs existing in the regional economy of northeast Indiana, including positions as a "wire worker" or an assembler of electrical accessories or small products. Even with the added restriction of sedentary instead of light work, said the VE, the person still could perform work as an "addresser in the clerical field," an optical assembler, or surveillance monitor.

Before ruling, the ALJ continued the hearing and requested updated records from Parkview North Hospital and Park Center. Parkview North Hospital responded that Martin had not been a patient there since January 2005, and Park Center responded by sending duplicates of the records already in the administrative record from Martin's treatment in 2004. The ALJ thus relied on the hearing testimony and Martin's medical records from 2003 through 2005 to conclude that his impairments, although severe enough to prevent him from returning to his past work in a warehouse, do not preclude him from "making a successful adjustment to other work that exists in significant numbers in the national economy." Accordingly, the ALJ found that Martin is not disabled.

Martin appeals pro se and raises two primary arguments. He contends, first, that the ALJ failed to adequately develop the record and, second, that the ALJ was prejudiced against him at the hearing. As to the first of these contentions, an ALJ has a general duty to "develop a full and fair record." *Smith v. Sec'y of Health, Educ. & Welfare*, 587 F.2d 857, 860 (7th Cir. 1978); *see Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009). Martin does not dispute that the ALJ satisfied that duty regarding medical records covering the 12 months preceding his November 2004 application for benefits. *See* 42 U.S.C. §§ 423(d)(5)(B), 1382c(a)(3)(H)(i); 20 C.F.R. § 416.912(d). Rather, says Martin, the ALJ should have but did not obtain medical records covering 2006 and 2007 from Parkview Hospital, Park Center, Vocational Rehab, and Indiana Surgical Specialists.

The ALJ met his burden to develop the record in this case. An ALJ is required to make a "reasonable effort" to ensure that the claimant's record contains, at a minimum, enough information to assess the claimant's RFC and to make a disability determination. *See* 20 C.F.R. §§ 416.912(d), 416.927(c)(3); S.S.R. 96-8p; *Skinner v. Astrue*, 478 F.3d 836, 843-44 (7th Cir. 2007). Although the ALJ's duty was heightened because of Martin's pro se status, this court "generally upholds the reasoned judgment of the Commissioner on how much evidence to gather, even when the claimant lacks representation." *Nelms*, 553 F.3d at 1098. Here, the ALJ made a concerted effort to probe Martin's recent medical history and ongoing impairments by asking specific questions about his treatment, symptoms, and day-to-day activities. *See Luna v. Shalala*, 22 F.3d 687, 692-93 (7th Cir. 1994) (holding that ALJ sufficiently developed record by probing all relevant issues, extensively questioning claimant about his pain, medication, and activities, and reviewing available medical records). The ALJ also requested updated records both before and after the hearing, and despite some apparent confusion about whether he visited Parkview Hospital or Parkview North Hospital, the ALJ's various efforts to develop the record were reasonable. *See* S.S.R. 96-8p; 20 C.F.R. § 416.912(d); *cf. Nelms*, 553 F.3d at 1098-99 (holding that ALJ failed to adequately develop record where he did not question pro se claimant about recent medical history or make any attempt to gather additional records despite two-year evidentiary gap). And although in his appellate brief Martin names other medical facilities that he visited in 2006 and 2007, such as Vocational Rehab and Indiana Surgical Specialists, he failed to name these facilities at the hearing despite the ALJ's pointed questioning about his recent treatment. The ALJ, therefore, cannot be faulted for not obtaining records from these facilities. After all, "[e]ven a pro se litigant bears some responsibility for making a record." *Johnson v. Barnhart*, 449 F.3d 804, 808 (7th Cir. 2006).

Thus, Martin must show that he was prejudiced by the absence of medical records dating after 2005, a hurdle he did not overcome. *See Nelms*, 553 F.3d at 1098; *Nelson v. Apfel*, 131 F.3d 1228, 1235 (7th Cir. 1997). Martin did not identify or provide additional records during the proceedings before the Appeals Council or the district court, and even now he

has not attempted to detail what additional information about his condition the ALJ would have uncovered. *See Nelms*, 553 F.3d at 1098 & n.1 (evaluating claimant's additional records submitted for limited purpose of demonstrating prejudice). Moreover, Martin fails to explain how additional evidence could have led to a finding of disability. *See id.*; *Johnson*, 449 F.3d at 808; *Nelson*, 131 F.3d at 1236.

Martin's second contention, that the ALJ was prejudiced, requires little discussion. In evaluating such claims, we begin with the presumption that ALJs are impartial, and to overcome that presumption, a claimant must show that the ALJ "displayed deep-seated and unequivocal antagonism that would render fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 556 (1994); *see Schweiker v. McClure*, 456 U.S. 188, 195 (1982); *Keith v. Barnhart*, 473 F.3d 782, 788 (7th Cir. 2007). Martin asserts that both the ALJ and the VE made "a mockery" of his condition when, following an outburst from Martin describing flashbacks he has from the shootings and an outpouring of profanity at the end of the hearing, the VE stated, "Maybe next time it'll kill him." This statement was indeed unprofessional and inappropriate, but it was made by the VE, not the ALJ, and Martin does not point to anything said or done by the ALJ exhibiting prejudice. Rather, our review of the hearing transcript reveals that the ALJ thoroughly explored Martin's impairments and recent medical history, and patiently attempted to elicit information relevant to his application for benefits. *See Keith*, 473 F.3d at 788. Thus, Martin's claim of prejudice is unavailing.

Finally, we have evaluated Martin's remaining arguments and have determined that they are without merit. Accordingly, we AFFIRM the judgment of the district court.