NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
FED. R. APP. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued March 2, 2010
Decided April 13, 2010

**Before**

DIANE P. WOOD, *Circuit Judge*

ANN CLAIRE WILLIAMS, *Circuit Judge*

DAVID F. HAMILTON, *Circuit Judge*

No. 09-2595

| | |
|---|---|
| JENNIFER RICHARDS, | Appeal from the United States District |
| *Plaintiff-Appellant,* | Court for the Northern District of |
| | Illinois, Eastern Division. |
| *v.* | |
| | No. 08 C 972 |
| MICHAEL J. ASTRUE, | |
| Commissioner of Social Security | Charles R. Norgle, Sr., |
| *Defendant-Appellee.* | *Judge.* |

**O R D E R**

Jennifer Richards applied for disability insurance benefits after suffering a retinal tear in her right eye, and she later amended her application to include claims of disabling depression and anxiety. An administrative law judge concluded that Richards could perform her past relevant work as a cashier and customer-service representative and denied the application. The district court upheld the ALJ's decision, but we conclude that the ALJ erred in assessing Richards's credibility, the limiting effects of her

mental impairments, and her residual functional capacity. Accordingly, we vacate and remand for further proceedings.

## I. BACKGROUND

Richards is a 51-year-old mother of four with a high-school education. In September 2004 she underwent laser treatment to seal off a retinal tear in her right eye. The surgery was successful, but Richards nevertheless applied for disability insurance benefits the following month, claiming that she was disabled by an eye impairment. A state-agency physician reviewed Richards's medical records and noted that she had some visual limitations and should avoid concentrated exposure to hazards such as machinery and heights, but the agency concluded that she was not disabled and denied her application.

Richards requested a hearing before an ALJ and, in the interim, amended her application to include claims of disabling depression and anxiety. In support of these new claims, she submitted records dating back to the late 1980s, when she was placed under the supervision of state child-welfare authorities following reports of abuse. Since at least 1995 Richards has been diagnosed with depression and has regularly attended therapy with a licensed clinical social worker. She submitted detailed records from therapy sessions until 2003, which were sometimes as frequent as once a week and focused primarily on stress caused by parenting and employment (or lack thereof). Richards switched therapists in 2004, and the record includes only general "treatment plans" that her new therapist, Marsha Smith, drew up at six-month intervals. These plans contemplated that Smith would see Richards for hour-long individual therapy sessions twice a month focused on managing her depression and stress, increasing her social support, and developing strategies for finding employment. In a letter to the SSA in July 2006, Smith opined that Richards "has symptoms of chronic depression and anxiety which interfere with her ability to pursue or maintain employment."

Richards also submitted treatment records from a psychiatrist whom she consulted three times between September 2005 and July 2006. Richards's chief complaints during these visits were lack of energy, difficulty sleeping, nightmares, crying spells, irritability, and trouble controlling her anger, which she attributed to memories of sexual abuse she suffered as a child. At the first visit, the psychiatrist diagnosed Richards with depression and assigned her a Global Assessment of Functioning ("GAF") score of 60-70, which indicates a patient with "some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social,

occupational, or school functioning" but who is "generally functioning pretty well."[1] *See* AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. 1994) ("DSM-IV"). The psychiatrist prescribed Lexapro, a drug used to treat major depressive disorder and generalized anxiety disorder, *see* PHYSICIAN'S DESK REFERENCE 1160-61 (64th ed. 2010), and Ativan, another drug prescribed for generalized anxiety disorder, *see* PDR FAMILY GUIDE TO PRESCRIPTION DRUGS 66 (9th ed. 2002). The doctor renewed these prescriptions in May 2006, and at Richards's next appointment two months later, the psychiatrist noted that Richards was "feeling better, but still depressed" and was suffering from "psychomotor retardation." The doctor increased her Lexapro dosage and added a prescription for Wellbutrin, another antidepressant. *See id.* at 748.

At her hearing in July 2006, Richards testified that stress and nightmares kept her up at night, that she had problems with concentration and memory, and that she got upset and mad easily. She reported that her "whole body ache[d]" and that, as a result, she seldom left the house. She attributed her depression primarily to earlier episodes of sexual abuse and domestic violence, which she began thinking about with increased frequency once her children had grown and left her home. Richards testified that although she had worked at the Northwestern University bookstore for roughly five hours a week during the back-to-school rush, she was collecting unemployment benefits at the time of the hearing.

After hearing Richards's testimony, the ALJ asked a vocational expert if an individual with Richards's age, education, and work experience could perform her past work as a cashier and customer-service representative if she (1) could sit, stand, and/or walk for at least 6 hours out of an 8-hour workday, (2) could lift and carry up to 10 pounds frequently and up to 20 pounds occasionally, (3) needed to avoid concentrated exposure to unprotected heights and hazardous machinery, and (4) could not perform a job requiring good binocular vision or depth perception. The VE opined that such an individual could perform Richards's past jobs. When asked if the person could perform those jobs if she "should have no regular general public contact, and is limited to jobs that are low to moderate stress," the VE opined that she could not but added that she could perform other jobs including office helper, laundry worker, and production worker.

---

[1] A GAF score of 51-60 indicates a patient with moderate symptoms, while a score of 61-70 indicates a patient with mild symptoms. DSM-IV at 32. It is unclear whether, by assigning Richards a score of 60-70, the psychiatrist believed that her symptoms might fall in the moderate range or whether, more likely, he simply made an oversight.

The ALJ evaluated Richards's claim under the familiar sequential analysis. *See* 20 C.F.R. § 404.1520. At step one, the ALJ found that Richards had not performed substantial gainful activity since the alleged onset of her disability. At step two, the ALJ found that Richards had severe impairments of "slight decreased visual acuity," "mild depression/anxiety," and obesity, but at step three she found that none of these met or equaled a listed impairment. Moving on to step four, the ALJ concluded that Richards had the residual functional capacity ("RFC") to lift 20 pounds occasionally and 10 pounds frequently, and to stand or walk at least 6 hours and sit at least 8 hours in an 8-hour workday. The ALJ also found that Richards could not perform "complex job tasks" or jobs requiring good binocular vision or good depth perception and must avoid exposure to unprotected heights and dangerous moving machinery. In reaching these conclusions, the ALJ found Richards not credible and thus discounted her testimony about the limiting effects of her depression and anxiety. Finally, the ALJ concluded that Richards was capable of performing her past relevant work as a cashier and customer-service representative and therefore was not disabled.

## II. ANALYSIS

We review the district court's decision de novo, reviewing the ALJ's decision directly. *Moss v. Astrue*, 555 F.3d 556, 560 (7th Cir. 2009). We will uphold the ALJ's decision if it is supported by substantial evidence, meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009) (internal quotation marks and citations omitted). The ALJ need not address every piece of evidence in the record but must "build an accurate and logical bridge from the evidence to his conclusion." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

### A.     Special Technique

Richards first argues that the ALJ failed to follow the procedure for evaluating mental limitations described in 20 C.F.R. § 404.1520a. *See generally Craft v. Astrue*, 539 F.3d 668, 674-75 (7th Cir. 2008). Under this so-called "special technique," the ALJ must, in determining whether the claimant has a severe impairment (step two of the five-step analysis), rate the degree of the functional limitation resulting from the claimant's impairment with respect to four broad functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3). The ALJ must rate the claimant's limitation in the first three categories as none, mild, moderate, marked, or extreme, and number the claimant's episodes of decompensation. *Id.* § 404.1520a(c)(4). If there are no episodes of decompensation and the rating in each of the first three categories is none or mild, the

impairment generally is not considered severe and the claimant thus is not disabled. *Id.* § 404.1520a(d)(1). Otherwise, the impairment is classified as severe, and the ALJ continues on to steps three through five of the standard five-step analysis. *Id.* § 404.1520a(d)(2). ALJs formerly were required to enter this information on a standard document known as a Psychiatric Review Technique Form ("PRTF") and append it to their decision, *see Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2003), but now they need only incorporate into their decision the pertinent findings and conclusions based on the technique, *see* 20 C.F.R. § 404.1520a(e)(2).

Although the government insists that the ALJ followed the special technique, it is clear that she did not, at least not to the letter. The ALJ nowhere mentioned that she was applying the technique, and although the ALJ happened to assign Richards a rating in each of the four functional categories, she did this at step three of her five-step analysis (not at step two, as the technique requires) and did not explain how she had reached her conclusions. *See* 20 C.F.R. § 404.1520a(e)(2). The ALJ did recount some of Richards's mental-health history in the RFC analysis, but we have cautioned that "the RFC analysis is not a substitute for the special technique, even though some of the evidence considered may overlap." *See Craft*, 539 F.3d at 675.

An ALJ's failure to explicitly use the special technique may be harmless error, *Craft*, 539 F.3d at 675; *see also Rabbers v. Comm'r SSA*, 582 F.3d 647, 654-57 (6th Cir. 2009), but here, however, the ALJ's misstep is compounded by other errors in her analysis, and the combined effect of these errors requires a remand. Most significantly, we are troubled that the ALJ rated Richards's mental functional limitations without the benefit of any medical professional's assessment of her mental RFC. Typically, when an applicant claims a mental impairment, the agency's medical or psychological consultant will complete a PRTF and assess the severity of the impairment before the case reaches an ALJ. 20 C.F.R. § 404.1520a(e)(1); *see, e.g., Villano v. Astrue*, 556 F.3d 558, 561 (7th Cir. 2009); *Young v. Barnhart*, 362 F.3d 995, 999 (7th Cir. 2004). But Richards's case is unusual because her initial application claimed only an eye impairment, and thus the state-agency physicians who reviewed her file evaluated only the effect of her visual limitations on her ability to work. Richards's therapist, however, opined that she "has symptoms of chronic depression and anxiety which interfere with her ability to pursue or maintain employment."[2]

---

[2] Although evidence from a social worker may not be used to establish whether a claimant has a medically determinable impairment, it may be used to show the severity of the claimant's impairment(s) and how it affects her ability to work. 20 C.F.R. § 404.1513(a), (d)(1).

Although an applicant for disability benefits bears the burden of proving that she is disabled, an ALJ may not draw conclusions based on an undeveloped record and "has a duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernable." *Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004); *see also Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009); *Smith v. Apfel*, 231 F.3d 433, 437-38 (7th Cir. 2000); 20 C.F.R. § 404.1545(a)(3) ("[B]efore we make a determination that you are not disabled, we are responsible for developing your complete medical history. . . ."). The government is correct that there is no absolute requirement that an ALJ remand a case simply because a PRTF was not completed at the initial or reconsideration level. *See* 20 C.F.R. § 404.1520a(e)(3) (providing that ALJ *may* consult medical expert or remand to state agency *if* unable to apply special technique on her own). But one of the stated goals of the special technique is to help the agency "[i]dentify the need for additional evidence to determine impairment severity," *id.* § 404.1520a(a)(1), and the need for additional evidence about the limiting effects of Richards's depression and anxiety was apparent.

Richards's psychiatrist noted that she suffered psychomotor retardation, lack of energy, difficulty sleeping, nightmares, crying spells, irritability, and trouble controlling her anger—all symptoms which would certainly bear on her ability to work. The psychiatrist also diagnosed Richards with depression and noted on Axis IV of her DSM assessment that "problems with social environment" affect her ability to function, but he never opined on how these impairments affect Richards's functional capacity for employment. Yet, without any medical professional having rated Richards's limitations in the areas of daily living, social functioning, and concentration, persistence, and pace, the ALJ assigned a rating of "mild" in each category. In the absence of any expert foundation for these ratings, we cannot discern the necessary logical bridge from the evidence to the ALJ's conclusions.

## B. Credibility

We are also troubled by the ALJ's credibility assessment. A credibility finding is entitled to considerable deference, but only if the ALJ justifies her conclusions with reasons that are supported by the record. *Terry*, 580 F.3d at 477. Here, the ALJ failed to substantiate her conclusions with accurate references to the record. For example, the ALJ stated that Richards had "described daily activities that are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations," but the ALJ did not specify what activities she meant. In fact, Richards testified that her daily activities were often limited to sleeping and looking out the window, and she reported that on most days she was too depressed to leave the house, even for groceries, or to

socialize with family or friends. Although she testified that she went to doctor's appointments and sometimes cooked and cleaned, she explained that her daughter frequently helped her with these chores. The ALJ did not adequately explain how the very minimal activities Richards described contradict a claim of a disabling mental disorder. *See Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).

The ALJ also supported her adverse credibility finding by noting that Richards had not gone to therapy on a regular basis, but this mischaracterizes the record. Although Richards did not submit detailed records from her sessions with her most recent therapist, the therapist's treatment plans indicate that Richards was attending hour-long individual therapy sessions twice a month. Nor was there support for the ALJ's conclusion that Richards's medication had been "relatively effective" in controlling her symptoms. At their last consultation, Richards's psychiatrist noted new symptoms of psychomotor retardation and tearfulness, doubled Richards's Lexapro dosage, and added a prescription for Wellbutrin, a drug used to treat major depression.

Also flawed is the ALJ's finding that, although Richards "alleges she is too stressed to go out and work, she works at a stressful cashier job and only at the busiest times." This is a significant overstatement. Richards testified that she was a standby employee at the Northwestern University bookstore and worked roughly five hours a week during the back-to-school rush. But she also testified that she was late for work every day because nightmares kept her up at night and that her boss allowed her to take breaks when she was not feeling well or was having a panic attack. That Richards was able to maintain temporary employment for a few hours a week with accommodations from a generous supervisor does not contradict her claim of disability. *See Henderson v. Barnhart*, 349 F.3d 434, 435-36 (7th Cir. 2003). Further, the ALJ failed to consider the difference between being able to work a few hours a week and being able to work eight hours a day five days a week. *See* SSR 96-8p, 1996 WL 374184, at *1; *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004).

Finally, the ALJ also erred when she questioned the reliability of Richards's claims on the ground that she was receiving unemployment compensation. Although we have noted that a claimant's representations in seeking unemployment benefits may be relevant in assessing the credibility of her representations to the SSA, *Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005), Richards testified that she sought unemployment benefits only because she had no other source of income. A desperate person might force herself to work—or in this case, certify that she is able to work—but that does not necessarily mean she is not disabled. *See Gentle v. Barnhart*, 430 F.3d 865,

867 (7th Cir. 2005); *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 918 (7th Cir. 2003).

### C.    RFC Analysis

The ALJ's errors above also led to a flawed analysis of Richards's residual functional capacity.  The only mental limitation the ALJ noted in the RFC was Richards inability "to perform complex job tasks."  But the ALJ did not explain which of Richards's mental limitations she meant to capture with this finding.  *See Young v. Barnhart*, 362 F.3d 995, 1002-03 (7th Cir. 2004).  Although the ALJ apparently credited notations in Richards's psychiatric records that she had depression, anxiety, irritability, difficulty controlling her anger, and problems with her social environment, the ALJ did not address how these limitations might impact Richards's ability to respond appropriately to supervision, co-workers, and work pressures, or reduce her ability to do her past work or other work. *See* 20 C.F.R. § 404.1545(c); *Villano*, 556 F.3d at 563 (explaining that ALJ must evaluate all limitations that arise from medically determinable impairments, even those that are not severe).  The ALJ apparently contemplated a more limited mental RFC during the hearing—the second hypothetical she posed to the VE included limitations of "no regular general public contact" and "jobs that are low to moderate stress"—but abandoned these limitations without explanation in her final decision.

### D.    Obesity and Visual Impairments

Richards's remaining arguments are less convincing.  She argues that the ALJ erred in failing to consider the effect of her obesity on her other impairments, but we have repeatedly characterized an ALJ's failure to explicitly discuss a claimant's obesity as harmless error when the ALJ factors obesity "indirectly" into her decision. *See, e.g.*, *Prochaska v. Barnhart*, 454 F.3d 731, 736-37 (7th Cir. 2006); *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004).  Here, the ALJ explicitly noted that Richards was morbidly obese but implicitly concluded that her obesity had no effect on her RFC.  Richards recites from Social Security Ruling 02-1p, 2000 WL 628049, some of the possible ways obesity may affect other impairments, but she does not contend that any of those examples apply to her or identify any actual effect of her obesity, and nothing in her medical records suggests that it aggravated her depression or anxiety.

Richards also faults the ALJ for not fully incorporating her visual impairments into the RFC: Although the state-agency physicians who reviewed her records checked off boxes on a standard form to reflect that she was limited in her near and far acuity, accommodation, and field of vision, the ALJ made a general finding that Richards could

not perform jobs "requiring good binocular vision or good depth perception."  But any error in not reciting the state-agency physicians' precise findings is harmless because it is clear that the ALJ simply collapsed them into her broader finding.  Indeed, when asked at the hearing about her visual limitations, Richards testified only that she had last seen her eye doctor about a year earlier when he prescribed new glasses, which she needs only for reading and driving.

### III. CONCLUSION

We VACATE the judgment of the district court and REMAND for further proceedings.  On remand the agency should reevaluate Richards's mental limitations and residual functional capacity with the benefit of an expert opinion and reassess Richards's credibility in light of the entire record.