**NONPRECEDENTIAL DISPOSITION**

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued August 8, 2012
Decided August 22, 2012

**Before**

WILLIAM J. BAUER, *Circuit Judge*

DIANE P. WOOD, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

No. 12-1484

| | |
|---|---|
| DANNY WILCOX,<br>   *Plaintiff-Appellant*,<br><br>  *v.*<br><br>MICHAEL J. ASTRUE, Commissioner of<br>Social Security,<br>   *Defendant-Appellee*. | Appeal from the United States District Court for the Northern Division of Indiana, South Bend Division.<br><br>No. 3:11cv32 CAN<br><br>Christopher A. Nuechterlein,<br>*Magistrate Judge*. |

**O R D E R**

Danny Wilcox applied for disability insurance benefits and supplemental security income in 2008, claiming to be disabled by tendinitis, carpal tunnel syndrome, degenerative disc disease, high blood pressure, chronic back pain, vision problems, and a learning disability. An administrative law judge from the Social Security Administration found that Wilcox was not disabled and denied benefits. That decision was affirmed by a magistrate judge presiding by consent. See 28 U.S.C. § 636(c). On appeal to this court, Wilcox presents three arguments: first, that in light of his lack of resources, the ALJ should have ordered additional psychological and medical evaluations; second, that the ALJ erred by discrediting his testimony of disabling pain;

and third, that the ALJ erred by finding that he was capable of doing light work. Bearing in mind the deferential standard of review that applies, see 42 U.S.C. § 405(g), we conclude that substantial evidence supports the agency's determination. We therefore affirm.

**I**

Wilcox applied for disability insurance benefits and supplemental security income (which are governed by virtually identical statutes for our purposes) in May 2008. As we noted above, he suffers from a number of conditions, which he listed in support of his application. Previously, Wilcox had worked as a press operator, warehouse worker, machine operator, loader and unloader, auto detailer, and construction worker. In fact, the May 2008 application was not Wilcox's first. He had presented an earlier claim for benefits based on his degenerative disc disease and partial blindness, but that claim was denied on February 13, 2008. Rather than appeal from that decision, Wilcox filed the present application based on a new onset date of February 28, 2008. Wilcox's insured status expired on December 31, 2009, which means that he cannot rely on an onset date after that time.

Wilcox's medical records show that he began complaining about pain in his arms and back as early as 2000. An MRI performed at that time revealed disc protrusion in one location in his back and mild disc dessication in three spots. Electromyography (EMG) testing showed that he might also be suffering from tardy ulnar nerve palsy, a condition that causes numbness, loss of coordination, weakness, and pain in the hands. See U.S. Nat'l Library of Medicine, *Ulnar nerve disfunction*, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001793/. In January 2008, Wilcox consulted his personal physician, Dr. Paolo Giacomini, after injuring his back while dragging a deer out of the woods. An examination in October 2008 revealed that he had tendinitis in both hands.

In June 2008, Dr. Russell Coulter-Kern, a psychologist, conducted a mental-status examination on Wilcox at the request of the Indiana Disability Determination Bureau. Wilcox reported that he had a depressed mood, diminished energy, feelings of worthlessness, difficulty concentrating, and frequent thoughts of death. Dr. Coulter-Kern gave him a mixed assessment. On the one hand, he rated as good Wilcox's judgment, insight, long-term memory, and ability to understand and interpret abstract information. He also thought that Wilcox's short-term memory and ability to perform basic mathematical calculations were "fair." On the other hand, he rated Wilcox's immediate memory as "poor" and his IQ as "low" (without assigning any numeric value to it). He opined that Wilcox's ability to handle his own affairs was questionable. He diagnosed Wilcox with depression and gave him a current Global Assessment of

Functioning score of 60 (one at the margin between moderate and mild symptoms).[1]

The following month Dr. Mubashir Khan conducted a consultative physical examination of Wilcox for the Disability Determination Bureau. Wilcox complained of chronic lower back pain, carpal tunnel syndrome, tendinitis in both elbows, blindness in his left eye, and difficulty lifting, pushing, pulling, and gripping. Dr. Khan thought that Wilcox communicated "very well" and did not appear to be in distress. Wilcox walked with a slow but sustainable gait, could stand on his toes and heels, and could squat with some difficulty. He had normal range of motion in all joints, normal motor and sensory examination results, and normal muscle tone, bulk, plantar reflexes, and fine and gross hand-movement function. Like other doctors before him, Dr. Khan concluded that Wilcox had chronic lower back pain, elbow tendinitis, carpal tunnel syndrome, a learning disability, and vision loss in his left eye.

In addition to these examining physicians, several state-agency doctors reviewed Wilcox's medical records. Dr. J. Sands optimistically opined that Wilcox could carry 50 pounds occasionally and 25 pounds frequently, could sit, stand, or walk for up to six hours in an eight-hour workday, and had unlimited ability to push and pull. Dr. B. Whitney agreed with Dr. Sands. Dr. J. Gange, a psychologist, believed that Wilcox was experiencing only mild restrictions in activities of daily living, in social functioning, and in maintaining concentration, persistence, and pace. Dr. Gange noted that Wilcox had trouble reading and writing but that he had nonetheless learned to drive and to carry out a wide variety of activities, including deer hunting and auto maintenance. All told, Dr. Gange concluded that the evidence did not support Wilcox's claim of a severe mental-health impairment. A second psychologist, Dr. Joelle Larsen, agreed with Dr. Gange.

On this record, the Social Security Administration denied Wilcox's claims, both initially and after Wilcox's request for reconsideration. Wilcox then requested a hearing before an ALJ, and that hearing took place in 2010.

At the hearing, Wilcox testified about his various disabilities. He reported that his back pain forces him to change positions between sitting and standing quite frequently – every five to ten minutes. The pain and swelling in his elbows, he said, make it difficult for him to move his arms or hands, and he cannot lift 20 pounds. After hearing from Wilcox and reviewing the medical evidence, the ALJ heard testimony from Charles McBee, a vocational expert. In response to a hypothetical posed by the ALJ, McBee stated that a person of Wilcox's age (53 at the time of the hearing) with similar education, work experience, and limitations would be

---

[1] A GAF score of 41–50 indicates serious symptoms; a score of 51–60 indicates moderate symptoms; and a score in the range of 61–70 indicates mild symptoms. Am. Psychiatric Ass'n, DIAGNOSIS AND STATISTICAL MANUAL OF MENTAL DISORDERS 32–34 (4th ed. 2000).

unable to perform Wilcox's past jobs but could work in unskilled positions such as a laundry folder, garment bagger, or "palletizer" (packaging materials in protective shipping pallets).

The ALJ went through the required five-step evaluation of Wilcox's claim, see 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4), concluding as follows: Step 1 – Wilcox had not worked since his alleged onset date; Step 2 – he suffers from a number of severe impairments, which the judge listed; Step 3 – none of those impairments met or equaled a listing; Step 4 – in light of Wilcox's residual functional capacity (which the ALJ found allowed Wilcox to perform light work, occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds, and stand, walk, and sit up to six hours in an eight-hour day) that Wilcox could not perform his past relevant work; but, Step 5 – Wilcox was capable of performing a significant number of jobs in the national economy and was thus not "disabled." The Appeals Council declined to review the ALJ's decision.

Between the ALJ's hearing and his appeal to the district court, Wilcox changed lawyers. He argued in the district court that his former counsel had asked the agency to send him out for IQ tests and medical tests, and that it was error for the ALJ not to order IQ tests and an MRI of his back. We can see in the record where Wilcox proposed more x-rays and another MRI, and counsel told us at oral argument that the IQ test was also requested, and so we will assume that Wilcox properly exhausted these points. Wilcox also argued to the district court that the ALJ should have given more weight to his testimony about the intensity, persistence, and limiting effects of his symptoms, and that the ALJ erred by accepting the vocational expert's opinion that Wilcox was capable of working the jobs the expert mentioned. The district court, however, concluded that the ALJ had reasonably declined to order further tests and examinations, that the judge adequately explained his credibility finding, and that the Step 5 determination was supported by substantial evidence. In this court, Wilcox continues to urge the same points.

## II

Our focus is on the ALJ's decision, because the Appeals Council declined review. *Scott v. Astrue,* 647 F.3d 734, 739 (7th Cir. 2011). We begin with Wilcox's contention that the ALJ erred by not ordering additional physical and psychological testing. This omission, in his view, violated the ALJ's duty to develop the record enough to permit a proper assessment of his claims of low mental functioning and severe back pain.

While it is true that proceedings before a social security ALJ are not purely adversary, and that the ALJ bears some responsibility for developing the record, the question whether this type of intervention is necessary is not susceptible to a mechanical answer. The circumstances in which an ALJ should obtain additional evidence are addressed only generally in the agency's regulations: An ALJ may order a consultative examination when "the evidence as a whole is insufficient to support a determination or decision on [the] claim." 20 C.F.R. § 416.919a(b); see

*Skinner v. Astrue,* 478 F.3d 836, 844 (7th Cir. 2007); see also *Ingram v. Astrue,* 496 F.3d 1253, 1269 (11th Cir. 2007); *Hawkins v. Chater,* 113 F.3d 1162, 1169 (10th Cir. 1997); *Barrett v. Shalala,* 38 F.3d 1019, 1023 (8th Cir. 1994). Thus, for example, if specialized medical evidence is required but is missing from the record, or if there is a change in condition but the current severity of the impairment is not established, additional examinations might be necessary. 20 C.F.R. § 416.919a(b). But the need for additional tests or examinations will normally involve a question of judgment, and we generally defer to the ALJ's determination whether the record before her has been adequately developed. Particularly in counseled cases, the burden is on the claimant to introduce some objective evidence indicating that further development is required. See *Nelms v. Astrue,* 553 F.3d 1093, 1098 (7th Cir. 2009); *Skinner,* 478 F.3d at 844; *Hawkins,* 113 F.3d at 1167. Moreover, on appeal, in order to obtain relief on this ground the claimant must show prejudice by pointing to specific medical evidence that was omitted from the record. *Nelms,* 553 F.3d at 1098.

Although we understand that Wilcox had limited resources, we see no abuse of the ALJ's discretion in the decision not to order additional tests here. A number of medical professionals, both private and state-employed, did evaluate Wilcox, and it is thus not clear what additional tests would have contributed. (It cannot be enough just to say that more is always better, and we do not understand Wilcox to be making that argument.) Nothing before the ALJ indicated that Wilcox's back or psychological condition had deteriorated between his medical examinations in the summer of 2008 and the end of his insured status in December 2009. (Evidence of change after the end of Wilcox's insured status would be irrelevant. See *Parker v. Astrue,* 597 F.3d 920, 924 (7th Cir. 2010); *Brisco ex rel. Taylor v. Barnhart,* 425 F.3d 345, 352 (7th Cir. 2005).) Wilcox does assert in his brief that the ALJ should have ordered "further MRI tests regarding his back to determine if that condition had worsened pursuant to the testimony of the Claimant," but we are not sure what testimony Wilcox is referring to. And in any event, the ALJ would still have had to decide whether a simple assertion of change was enough to require additional tests on his back. As for his mental disability, Wilcox did not explain what might have made that change. At least for adults, IQ is presumed to remain stable over time. See *Maresh v. Barnhart,* 438 F.3d 897, 900 (8th Cir. 2006); *Hodges v. Barnhart,* 276 F.3d 1265, 1268-69 (11th Cir. 2001). In summary, the ALJ did not violate the duty to develop the record in this case.

Next, Wilcox argues that the ALJ erred by declining to credit his testimony about the intensity, persistence, and limiting effects of his conditions. He maintains that if an ALJ concludes that a claimant's testimony about his pain is not supported by the record, then the ALJ must go the extra mile, develop the record further, and then give specific reasons for discounting the testimony. But, for reasons related to those we have just discussed, this goes too far. It is true that when evaluating statements about a claimant's symptoms, an ALJ must provide specific reasons for her credibility findings. See *Villano v. Astrue,* 556 F.3d 558, 562 (7th Cir. 2009). But once she does so, her credibility determinations are entitled to deference, and the court will not overturn them unless they are "patently wrong." *Jones v. Astrue,* 623 F.3d

1155, 1160 (7th Cir. 2010). The ALJ considered Wilcox's testimony and furnished a detailed discussion of Wilcox's assertions about the intensity and limiting effects of his conditions. At that point, however, the ALJ explained why she had chosen not to credit the limitations from which Wilcox claimed to suffer. The ALJ noted that the records from Wilcox's recent visits to his treating physician did not show that he had a disabling impairment, and that none of the consultative examiners found that the consequences of Wilcox's impairments were as drastic as Wilcox asserted. In addition, the ALJ observed that Wilcox did not have an obvious standing or walking problem at the hearing, that he was able to remain seated throughout the one-hour hearing, that he was able to drive himself the approximately 50 miles to the hearing without stopping, and that he showed almost no signs of being in pain despite testifying that he had not taken his pain medication that day in order to remain alert.

Finally, Wilcox argues that the ALJ's finding at Step 5 (that is, which jobs in the national economy his residual functional capacity allows him to perform) is not supported by substantial evidence. He urges that the hypothetical person described by the ALJ – someone who could pull hand controls, operate foot controls, lift and carry 20 pounds occasionally and 10 pounds frequently – does not describe him. He reiterates his testimony that he suffers from swelling, pain, and numbness in his hands and fingers, and is literally incapable even of carrying a cup of coffee for long. The ALJ should not have found that he can engage in light work, he maintains, because that is inconsistent with the acknowledgment that Wilcox was limited to jobs with a sit-stand option. In addition, Wilcox argues that his low IQ and the testing evidence in the record shows that he does not have the reading, writing, or math skills required to be a folder, bagger, or palletizer.

Once again, we are compelled to conclude that substantial evidence supports the ALJ's conclusions. The judge was required to incorporate into the hypothetical only those impairments that he found to exist, see *Schmidt v. Astrue,* 496 F.3d 833, 845-46 (7th Cir. 2007), and the medical evidence supports the ALJ's finding that Wilcox occasionally could  meet the criteria he described. Wilcox's limitation to jobs with a sit/stand option does not preclude him from working. And the ALJ accounted for his limited math and language skills by asking the vocational expert to disregard jobs "where reading, spelling, and math calculations would be an essential part of the job." The job of palletizer is listed in the *Dictionary of Occupational Titles* as one requiring level-two language and math skills, while the jobs of bagger and folder require only level one (the lowest possible) for both. See U.S. Dep't of Labor, *Dictionary of Occupational Titles*, §§ 929.687-054, 1991 WL 688180; 920.687-018, 1991 WL 687965; Appendix C, 1991 WL 688702, at *6-8.

For these reasons, we AFFIRM the judgment of the district court.